# CONNECTICUT COALITION AGAINST MILLSTONE ET AL. *v.* ARTHUR J. ROCQUE, JR., COMMISSIONER OF ENVIRONMENTAL PROTECTION, ET AL.
## (SC 16838)

Borden, Norcott, Palmer, Zarella and Pellegrino, Js.

Argued March 14—officially released December 23, 2003

*Nancy Burton,* for the appellants (plaintiffs).

*Mark P. Kindall,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Kimberly P. Massicotte,* assistant attorney general, for the appellee (named defendant).

*Linda L. Morkan,* with whom, on the brief, were *James P. Ray* and *Joey Lee Miranda,* for the appellee (defendant Dominion Nuclear Connecticut, Inc.).

*Elizabeth C. Barton,* with whom, on the brief, were *Harold M. Blinderman* and *Sharon M. Seligman,* for the appellee (defendant Northeast Nuclear Energy Company).

*Opinion*

ZARELLA, J. The principal issue in this appeal is whether the plaintiffs[1] have standing under General

---

[1] The plaintiffs in this case are Connecticut Coalition Against Millstone, an organization based in Mystic, advocating the use of safe and renewable

Statutes § 22a-16[2] to bring an action directly in the Superior Court against the defendants[3] for declaratory and injunctive relief from alleged violations of the federal Clean Water Act, 33 U.S.C. § 1251 et seq. The plaintiffs claim that the operations of the Millstone Nuclear Power Generating Station (Millstone) have resulted in unreasonable pollution and should be halted because Millstone has been functioning for several years without a valid water discharge permit and emergency authorization. The trial court granted the defendants' motions to dismiss the plaintiffs' complaint on the ground that the plaintiffs lacked standing to bring their action directly in the Superior Court and rendered judgment thereon. The plaintiffs appealed from the judgment of dismissal to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We affirm the judgment of the trial court.

energy; STAR Foundation, a nonprofit corporation based in East Hampton, New York, representing Long Island residents concerned about the toxic effects of nuclear contamination; New York State Assemblyman Fred Thiele; and North Fork Environmental Council, based in Long Island. North Fork Environmental Council is not a party to this appeal.

[2] General Statutes § 22a-16 provides: "The Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business . . . for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction provided no such action shall be maintained against the state for pollution of real property acquired by the state under subsection (e) of section 22a-133m, where the spill or discharge which caused the pollution occurred prior to the acquisition of the property by the state."

[3] The defendants are Arthur J. Roque, Jr., commissioner of environmental protection; Northeast Nuclear Energy Company; and Dominion Nuclear Connecticut, Inc.

The present action is one of several actions brought over the course of the last three years by organizations and individuals challenging the validity of water discharge authorizations issued by the state department of environmental protection (department) with respect to the operation of the Millstone facility in Waterford.[4] Prior to the commencement of this action, Millstone was operated by the defendant Northeast Nuclear Energy Company (Northeast). The facility utilizes seawater from Niantic Bay to cool its three nuclear reactors and discharges the heated water containing radioactive and toxic wastes into Long Island Sound.

The operations of the facility require department approval in the form of a water discharge permit,[5] which is valid for five years. The department last issued a discharge permit to Northeast on December 14, 1992, with an expiration date of December 13, 1997. Northeast submitted a timely permit renewal application on June 13, 1997.[6] The application is still pending, but Millstone continues to operate pursuant to General Statutes § 4-182 (b), which provides in relevant part that "[w]hen a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, the existing license shall not expire until the application has been finally determined by the agency . . . ."

---

[4] These actions include *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 1, 756 A.2d 262 (2000) (*Fish I*), and *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 21, 755 A.2d 860 (2000) (*Fish II*).

[5] Any person or municipality must obtain a national pollution discharge elimination permit prior to discharging any substance into the waters of the United States or Connecticut under the federal Clean Water Act, 33 U.S.C. § 1342 and General Statutes § 22a-430. In Connecticut, the department is responsible for issuing the federal and state discharge permits.

[6] General Statutes § 22a-430 (c) provides in relevant part: "An application for a renewal of a permit which expires after January 1, 1985, shall be filed with the commissioner at least one hundred eighty days before the expiration of such permit. . . ."

Millstone also discharges into the public waters certain toxic substances that are not covered by the 1992 permit.[7] On October 13, 2000, the department issued an emergency authorization pursuant to General Statutes § 22a-6k[8] that covers the additional discharges. The emergency authorization provides that it will expire "upon a final determination on [Northeast's] application for reissuance of [its water permit] or upon the [commissioner of environmental protection's] determination that the requirements of Section 22a-6k of the Connecticut General Statutes are no longer applicable to the activities authorized."

In February, 2001, the defendant Dominion Nuclear Connecticut, Inc. (Dominion), in conjunction with its efforts to acquire the Millstone facility,[9] applied to the department for the transfer of environmental permits issued to Northeast. On March 8, 2001, the plaintiffs commenced the present action in the judicial district of Hartford seeking: (1) a judgment declaring that the

---

[7] The additional toxic substances that are not covered by the 1992 permit include hydrazine and ethanolomine.

[8] General Statutes § 22a-6k provides in relevant part: "(a) The Commissioner of Environmental Protection may issue an emergency authorization for any activity regulated by the commissioner under section . . . 22a-430 . . . provided he finds that (1) such authorization is necessary to prevent, abate or mitigate an imminent threat to human health or the environment; and (2) such authorization is not inconsistent with the federal Water Pollution Control Act . . . . Such emergency authorization shall be limited by any conditions the commissioner deems necessary to adequately protect human health and the environment. . . ."

[9] Prior to submission of the application, Connecticut Coalition Against Millstone (CCAM) had sent a letter and notice of intervention to the commissioner requesting that the department commence an administrative proceeding to consider the anticipated application. The commissioner denied CCAM's request for an administrative proceeding and intervention, however, on the ground that a permit transfer does not require an administrative proceeding and hearing, but that, in the event that the permit was transferred, CCAM could request intervention in any subsequent administrative proceeding conducted with respect to renewal of the permit. The plaintiffs subsequently intervened in the permit renewal proceedings.

1992 permit had expired, that the emergency authorization was invalid and that neither the permit nor the authorization could be transferred; (2) a temporary and permanent injunction to prevent the continued operation of the Millstone facility; and (3) a temporary and permanent injunction to prevent the named defendant, Arthur J. Rocque, Jr., commissioner of environmental protection (commissioner), from approving the transfer of the permit and emergency authorization from Northeast to Dominion. According to the plaintiffs, the purpose of the requested relief was to protect "the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ."

The plaintiffs' requests for relief were based in part on allegations that the permit renewal application was invalid because the three nuclear reactors were shut down at the time the application was filed. Consequently, the Millstone facility was not engaged in operations of a continuing nature as required for application approval under § 4-182 (b). The plaintiffs also alleged that the emergency authorization had been issued in violation of the letter and spirit of the law because its issuance presumed the validity of the underlying permit and it was one in a series of authorizations routinely issued to Northeast over a period of years without notice to the public and without public participation.[10]

---

[10] Paragraphs eight, nine and ten of the plaintiffs' complaint allege that Millstone's operations generate pollution. Paragraphs eleven through seventeen and paragraph twenty allege that the operations of the facility require a permit, that the permit expired in December, 1997, that the permit has not been renewed and that Northeast filed an application for renewal of the permit 180 days prior to its expiration. Paragraph twenty-one alleges that the renewal application was invalid under § 4-182a (b) because Millstone was shut down and was not engaged in activities of a continuing nature at the time the application was filed. Paragraphs twenty-two through thirty allege that an emergency authorization improperly was issued to Northeast. Paragraphs thirty-five and thirty-six allege that the commissioner has no legal authority to approve the continued operation of Millstone following expiration of the 1992 permit and to issue the emergency authorizations.

On March 8, 2001, the plaintiffs also filed a separate application for a temporary injunction to enjoin the transfer of the permit and emergency authorization from Northeast to Dominion. Because of the imminent sale of Millstone to Dominion, the court ordered that a hearing be held prior to March 31, 2001, on the plaintiffs' application for a temporary injunction. On March 15, 2001, Northeast filed an application to transfer the case to the complex litigation docket in Norwich. The chief administrative judge of the civil division and presiding criminal judge for the judicial district of Hartford determined that the case should be transferred as requested, but scheduled the injunction hearing for March 27, 2001, in the judicial district of Hartford, as no judge was available in the Norwich court to hold the hearing prior to the end of March.

On March 29, 2001, following the hearing in Hartford, the court, *Schuman, J.*, issued a written opinion denying the plaintiffs' application for a temporary injunction. That same day, the department approved the transfer of all environmental permits and emergency authorizations from Northeast to Dominion. On March 30, 2001, the plaintiffs petitioned this court, pursuant to General Statutes § 52-265a, for certification to take a direct appeal from the trial court's denial of the application for a temporary injunction. The petition was denied on April 3, 2001. Meanwhile, by order dated March 27, 2001, the case was transferred to the complex litigation docket in Norwich.[11] Four days later, Northeast closed on the anticipated sale of Millstone to Dominion.

Paragraphs thirty-nine and forty allege that the activities of Millstone result, or are likely to result, in unreasonable pollution and that the action is brought pursuant to § 22a-16 for the protection of the public trust in the air, water and other natural resources from unreasonable pollution.

[11] The transfer order stated that objections to the order should be filed with the complex litigation docket in Norwich within twenty days. The plaintiffs filed an objection with the Hartford Superior Court on April 14, 2001. On April 17, 2001, the presiding judge for the complex litigation docket in the judicial district of Norwich, apparently unaware that the plaintiffs

While those proceedings were pending, all three defendants filed motions to dismiss the case,[12] claiming that the plaintiffs lacked standing under § 22a-16[13] of the Connecticut Environmental Protection Act, General Statutes § 22a-14 et seq. (CEPA), and had failed to exhaust their administrative remedies. The Superior Court in the judicial district of Hartford heard arguments on the motions to dismiss as well as on the motion for a temporary injunction at the March 27, 2001 hearing. Thereafter, the court issued a briefing schedule on the motions to dismiss in a footnote to its written opinion denying the application for a temporary injunction. Both sides filed briefs during the first two weeks in April, 2001. After the case was transferred to the complex litigation docket in Norwich, the court held a two day evidentiary hearing on the motions to dismiss. On July 19, 2001, the court, *Koletsky, J.*, granted the motions to dismiss in a ruling from the bench.

The court determined that the plaintiffs had "no standing to bring a § 22a-16 action to challenge either the transfer of the permit, the validity of the emergency authorization or the validity of the extension of the underlying 1992 permit with the expiration date of 1997," under the principles espoused in *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 21, 755 A.2d 860 (2000) (*Fish II*). The court explained: "[T]here is no question that [*Fish II*] requires the holding that the § 22a-16 action brought by the plaintiffs cannot be brought in an area expressly placed . . . within the

---

had filed an objection in the Hartford court, notified the parties that the case had been transferred. The Norwich court discovered that the objection had been filed, when the file was transferred sometime after April 17, 2001. The court then ordered a hearing on May 10, 2001, but ultimately overruled the plaintiffs' objections in a written opinion issued on June 20, 2001.

[12] The commissioner and Northeast filed motions to dismiss the case on March 19, 2001. Dominion filed a motion to dismiss the case on March 21, 2001.

[13] See footnote 2 of this opinion.

exclusive domain of the commissioner . . . ." The court further explained: "With respect to the challenges to the validity of the 1992 permit and its extension and the emergency authorizations, the court finds and holds that the plaintiffs lack standing to bring a § 22a-16 action in this proceeding or in this area which is committed by the legislature to the exclusive domain of the . . . commissioner. . . . Contrary to the plaintiffs' argument, the statutory scheme is logical, straightforward and uncomplicated. Section 22a-16 actions are not available where the commissioner . . . has the responsibility to act. When the commissioner . . . acts, there is an administrative appeal from that. There is still, the court opines, no § 22a-16 action after action by the commissioner, should the commissioner issue a permit to Millstone. . . . [A]s I said before, standing is not there." After the court granted the motions to dismiss, it denied the plaintiffs' motion for reargument, and this appeal followed.

The plaintiffs claim on appeal that the court improperly (1) granted the defendants' motions to dismiss their complaint for (A) lack of standing under § 22a-16 and (B) failure to exhaust their administrative remedies, and (2) denied their application for a temporary injunction. The plaintiffs also claim that alleged procedural irregularities in the hearing proceedings on the motions to dismiss were "prejudicial to the administration of justice." Because we agree with the trial court's ruling on the issue of standing, we do not reach the remaining issues raised in the appeal.

I

We first address the defendants' claim that the request of the plaintiffs for injunctive relief to enjoin the transfer of the permit and emergency authorization should be dismissed on the ground of mootness. The defendants point out that the commissioner long ago

approved the transfer of permits and authorizations and that, shortly thereafter, Northeast conveyed the Millstone facility to Dominion. The defendants therefore argue that there is no longer a controversy between the parties with regard to the transfers and the court can afford the plaintiffs no practical relief. Northeast further claims that the appeal should be dismissed insofar as it pertains to Northeast because Northeast retains no ownership or legal interest in the Millstone facility and has no control over the facility's current operations, and, thus, this court cannot provide the plaintiffs with any practical relief. We agree with the defendants on both claims of mootness.[14]

"Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the

[14] The defendants raised similar claims earlier in the proceedings. On May 3, 2002, prior to the transfer of the appeal to this court, Northeast and Dominion filed a motion with the Appellate Court seeking dismissal of the appeal on the ground of mootness. They argued that, even if the trial court should have granted the plaintiffs' motion for a temporary injunction, the commissioner's subsequent approval of the permit transfer, followed by the sale of the Millstone facility to Dominion, rendered it impossible for the court to grant the plaintiffs any practical relief. The Appellate Court denied the motion on July 17, 2002. Northeast filed a motion for reconsideration on July 26, 2002, arguing that it no longer owned or operated the facility and no longer held the related permits or authorizations, and, accordingly, a controversy no longer existed between the plaintiffs and Northeast. The Appellate Court denied the motion for reconsideration on September 11, 2002. In raising their present claims, the defendants do not seek to dismiss the appeal in its entirety, but only as to (1) the injunctive relief requested with respect to the permit transfer, and (2) Northeast in its capacity as a defendant. We note that the plaintiffs made no direct response in their briefs to the defendants' claims of mootness.

time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Giaimo* v. *New Haven*, 257 Conn. 481, 492–93, 778 A.2d 33 (2001).

Connecticut courts have rejected injunctive remedies on the ground of mootness where the issue before the court has been resolved or has lost its significance because of intervening circumstances. See *Waterbury Hospital* v. *Connecticut Health Care Associates*, 186 Conn. 247, 249–52, 440 A.2d 310 (1982) (court dismissed as moot plaintiff's request for injunctive relief to restrain picketing during strike because strike and picketing had ended while appeal was pending); *Daley* v. *Gaitor*, 16 Conn. App. 379, 381 n.2, 547 A.2d 1375 (court dismissed as moot plaintiff's request to enjoin city of Hartford from administering promotional examination to police officers following city's promotion of officers during pendency of appeal), cert. denied, 209 Conn. 824, 552 A.2d 430 (1988).

In the present case, following the court's denial of the application for a temporary injunction on March 29, 2001, the department approved the transfer of all environmental permits and authorizations from Northeast to Dominion. Two days later, Northeast conveyed the Millstone facility to Dominion. In light of the fact that the facility has been sold and that the permit and emergency authorization have long since been transferred, we conclude that the plaintiffs' request for injunctive relief to prevent the transfers from taking place is rendered moot. The plaintiffs' request for a judgment declaring that the permit and authorization may not be transferred also is rendered moot. Intervening circumstances have changed the legal landscape, a controversy no longer exists between the parties and

the court cannot grant the plaintiffs any practical relief. "[W]here the question presented is purely academic, we must refuse to entertain the appeal." (Internal quotation marks omitted.) *Waterbury Hospital* v. *Connecticut Health Care Associates*, supra, 186 Conn. 250.

Connecticut courts also have dismissed cases on the ground of mootness where the court can offer no practical relief because the position of one of the parties has changed. *Shays* v. *Local Grievance Committee*, 197 Conn. 566, 570–71, 499 A.2d 1158 (1985) (appeal regarding legality of sentence dismissed as moot because plaintiff completed sentence imposed while appeal was pending). In this case, Northeast's position changed when it sold the Millstone facility to Dominion. Northeast does not now own or operate the facility or hold the attendant permits and authorizations. Consequently, Northeast has no remaining connection with Millstone and a controversy can no longer be said to exist between Northeast and the plaintiffs. We therefore dismiss the appeal insofar as it relates to Northeast because the appeal has been rendered moot.

## II

We next address the issue of the plaintiffs' standing. The plaintiffs claim that the trial court improperly granted the defendants' motions to dismiss their complaint because § 22a-16 affords them standing to bring an action alleging unreasonable pollution for lack of a valid permit directly in the Superior Court. The defendants respond that past Supreme Court decisions have held that standing is not available under § 22a-16 to commence such claims directly in the Superior Court. We agree with the defendants.

We begin our analysis by setting forth the appropriate standard of review. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial

court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . .

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . .

"Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Classical

aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest. . . . Aggrievement does not demand certainty, only the possibility of an adverse effect on a legally protected interest. . . .

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Citations omitted; internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 485–87, 815 A.2d 1188 (2003).

"Traditionally, citizens seeking to protect the environment were required to show specific, personal aggrievement to attain standing to bring a legal action. . . . The Connecticut Environmental Protection Act; General Statutes § 22a-1 et seq.; however, waives the aggrievement requirement in two circumstances. First, any private party, including a municipality, without first having to establish aggrievement, may seek injunctive relief in court for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . . General Statutes § 22a-16. Second, any person or other entity, without first having to establish aggrievement, may intervene in any administrative proceeding challenging conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state. General Statutes § 22a-19 (a)." (Citation omitted; inter-

nal quotation marks omitted.) *Fish II*, supra, 254 Conn. 31.

In concluding that the plaintiffs lacked standing to bring their complaint directly in the Superior Court pursuant to § 22a-16, the trial court relied on our reasoning in *Fish II*, a case very similar to the present case. All of the plaintiffs[15] and one of the defendants[16] in the present case were parties in *Fish II*. Furthermore, the dispositive issue in *Fish II*, as here, was whether the plaintiffs had standing under § 22a-16 to commence an action in the Superior Court seeking (1) injunctive relief to prevent the operation of the Millstone facility and (2) a judgment declaring that the water discharge permit was invalid.[17] See id., 22–23.

Our analysis of the standing issue in *Fish II* was guided by our decisions in two earlier cases, *Connecticut Fund for the Environment, Inc.* v. *Stamford*, 192 Conn. 247, 470 A.2d 1214 (1984), and *Middletown* v. *Hartford Electric Light Co.*, 192 Conn. 591, 473 A.2d 787 (1984). In *Connecticut Fund for the Environment, Inc.*, the plaintiffs appealed to the Superior Court from a decision of the defendant Stamford environmental protection board approving an application to develop a large tract of land for use as a regional postal facility. *Connecticut Fund for the Environment, Inc.* v. *Stamford*, supra, 248. The environmental protection board

---

[15] There also were four additional plaintiffs in *Fish II*: Fish Unlimited, a national clean water fisheries conservation organization based in Shelter Island, New York; Don't Waste Connecticut, an environmental group based in New Haven; the town of East Hampton, New York; and the Green Party of Connecticut. See *Fish II*, supra, 254 Conn. 22 n.1.

[16] The two defendants in *Fish II* were Northeast and its parent company, Northeast Utilities Service Company. Northeast was involved in the management and operation of the three nuclear reactors. See *Fish II*, 254 Conn. 23 n.3.

[17] The plaintiffs in *Fish II* did not seek a declaratory judgment and injunctive relief to prevent the transfer of the permit and emergency authorization from Northeast to Dominion, as the plaintiffs do here.

was the city agency responsible for regulating activities affecting wetlands and watercourses in Stamford under the Inland Wetlands and Watercourses Act, General Statutes § 22a-36 et seq. Id. The plaintiffs, one of whom had intervened in the proceeding pursuant to General Statutes § 22a-19, claimed, inter alia, that the board had not considered air pollution, noise pollution and other environmental problems created by increased traffic that would be generated by the new development. Id., 251. The trial court dismissed the appeal.

In affirming the trial court's judgment, we concluded that "[s]ection 22a-19, which authorizes any person to intervene in any administrative proceeding and to raise therein environmental issues must be read in connection with the legislation which defines the authority of the particular administrative agency. Section 22a-19 is not intended to expand the jurisdictional authority of an administrative body whenever an intervenor raises environmental issues. Thus, an inland wetland agency is limited to considering only environmental matters which impact on inland wetlands. Other environmental impacts must be raised before other appropriate administrative bodies, if any, or in their absence by the institution of an independent action pursuant to § 22a-16. . . . [G]eneral environmental matters [involving air and noise pollution and environmental problems created by increased traffic] were not relevant to the proceedings before [the environmental protection board] and therefore its refusal to entertain comment or evidence of a noninland wetland nature was appropriate."[18] Id., 250–51.

---

[18] The principle that § 22a-19 does not expand the authority of an administrative body to consider environmental issues outside its jurisdiction and that, in such cases, an independent action may be brought pursuant to § 22a-16, has been affirmed in subsequent decisions of this court. *Connecticut Water Co.* v. *Beausoleil*, 204 Conn. 38, 46, 526 A.2d 1329 (1987); *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 155, 788 A.2d 1158 (2002); *Fort Trumbull Conservancy, LLC* v. *Alves*, supra, 262 Conn. 486–87.

Shortly thereafter, we issued our decision in *Middletown*, in which we employed similar logic to affirm the trial court's judgment that the plaintiffs lacked standing under § 22a-16 to seek an injunctive remedy against the defendants in the Superior Court. The *Middletown* plaintiffs had sought to enjoin the defendant utility company and its parent company from proceeding with a plan to burn contaminated mineral oil containing polychlorinated biphenyls (PCBs) at an electric generating plant, even though the defendants had obtained the approvals required for the disposal of substances containing PCBs from the department and from the United States Environmental Protection Agency. *Middletown v. Hartford Electric Light Co.*, supra, 192 Conn. 593–94. The trial court dismissed the complaint, and the plaintiffs appealed to this court from the judgment of dismissal. Id., 594.

The plaintiffs in *Middletown* claimed that they had standing under § 22a-16 to seek an injunction to preclude the proposed burning of oils containing PCBs on the basis of the defendants' "failure to obtain a variety of approvals and permits" including a water discharge permit under General Statutes § 22a-430. Id., 595. We rejected the plaintiffs' claim in reliance on our decision in *Connecticut Fund for the Environment, Inc.* Id., 597.

We first noted that § 22a-16 "permits any private party, including a municipality, to seek injunctive relief 'for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction.' We have recently concluded, however . . . that invocation of [CEPA] is not an open sesame for standing to raise environmental claims with regard to any and all environmental legislation. In *Connecticut Fund for the Environment, Inc.* v. *Stamford*, [supra, 192 Conn. 247], we held that § 22a-19 of [CEPA], which permits any person, on the filing of a verified pleading, to intervene in any

administrative proceeding and to raise therein environmental issues 'must be read in connection with the legislation which defines the authority of the particular administrative agency.' " *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 596–97. We then stated that the same principle that had informed our holding in *Connecticut Fund for the Environment, Inc.*, namely, that § 22a-19 did not expand the jurisdictional authority of an administrative body whenever an intervenor raised environmental issues, was applicable "to bar the [plaintiff] city's standing under the licensing statutes. The trial court was therefore correct in concluding that § 22a-16 did not provide the plaintiffs with standing under any statute other than [CEPA] itself." Id., 597.

We had no further occasion to address the issue of whether § 22a-16 confers standing to bring claims of unreasonable pollution under the licensing statutes until *Fish II*, where we affirmed our holding in *Middletown*. *Fish II*, supra, 254 Conn. 24. After reviewing our reasoning in *Middletown*, we concluded: "[T]he plaintiffs seek to use § 22a-16 to afford standing to raise permitting claims governed by § 22a-430. The department, however, has statutory and regulatory authority to issue water discharge permits, to determine the completeness of renewal applications and to pursue any one of several remedies if it concludes that a discharge is creating unreasonable pollution or is occurring without a valid permit. . . . Thus, we conclude that the plaintiffs lack standing to bring this action pursuant to § 22a-16." (Citation omitted.) *Fish II*, supra, 254 Conn. 32–34.

In the present case, we also conclude that the plaintiffs lack standing to bring their complaint pursuant to § 22a-16. We have stated that "one of the basic purposes of [CEPA] is to give persons standing to bring actions to protect the environment and standing is conferred

only to protect the natural resources of the state from pollution or destruction." *Mystic Marinelife Aquarium, Inc.* v. *Gill*, 175 Conn. 483, 499, 400 A.2d 726 (1978). Yet, here, the plaintiffs' claim of unreasonable pollution is based upon allegations that: (1) the 1992 permit became invalid on December 14, 1997, the day it expired, and has remained invalid since that time because the facility was not engaged in operations of a continuing nature as contemplated under § 4-182a (b) when the permit renewal application was filed; and (2) the issuance of the "emergency" authorization violated the letter and spirit of § 22a-6k because it was one in a series of authorizations *routinely* issued to Northeast over a period of years and, hence, did not address an "imminent threat to human health or the environment . . . ." General Statutes § 22a-6k (a) (1). Allegations of improper decisions by the commissioner for failure to comply with the statutory requirements regarding permit renewal proceedings and emergency authorizations cannot be construed as anything other than a licensing claim under § 22a-430.[19] Accordingly, following our

---

[19] General Statutes § 22a-430 provides in relevant part: "Permit for new discharge. Regulations. Renewal. Special category permits or approvals. Limited delegation. General permits. (a) No person or municipality shall initiate, create, originate or maintain any discharge of water, substance or material into the waters of the state without a permit for such discharge issued by the commissioner. Any person who initiated, created or originated a discharge prior to May 1, 1967, and any municipality which initiated, created or originated a discharge prior to April 10, 1973, for which a permit has not been issued pursuant to this section, shall submit an application for a permit for such discharge on or before July 1, 1987. Application for a permit shall be on a form prescribed by the commissioner, shall include such information as the commissioner may require and shall be accompanied by a fee of twenty-five per cent more than the amount established in regulations in effect on July 1, 1990. On and after July 1, 1991, such fees shall be as prescribed by regulations adopted by the commissioner in accordance with chapter 54. The commissioner shall not issue or renew a permit unless such issuance or renewal is consistent with the provisions of the federal Clean Water Act (33 USC 1251 et seq.).

"(b) The commissioner, at least thirty days before approving or denying a permit application for a discharge, shall publish once in a newspaper having a substantial circulation in the affected area notice of (1) the name

established precedent in *Middletown* and *Fish II*, we

of the applicant; (2) the location, volume, frequency and nature of the discharge; (3) the tentative decision on the application, and (4) additional information the commissioner deems necessary to comply with the federal Clean Water Act (33 USC 1251 et seq.). There shall be a comment period following the public notice during which period interested persons and municipalities may submit written comments. After the comment period, the commissioner shall make a final determination either that (A) such discharge would not cause pollution of any of the waters of the state, in which case he shall issue a permit for such discharge, or (B) after giving due regard to any proposed system to treat the discharge, that such discharge would cause pollution of any of the waters of the state, in which case he shall deny the application and notify the applicant of such denial and the reasons therefor, or (C) the proposed system to treat such discharge will protect the waters of the state from pollution, in which case he shall, except as provided pursuant to subsection (j) of this section, require the applicant to submit plans and specifications and such other information as he may require and shall impose such additional conditions as may be required to protect such water, and if the commissioner finds that the proposed system to treat the discharge, as described by the plans and specifications or such other information as may be required by the commissioner pursuant to subsection (j) of this section, will protect the waters of the state from pollution, he shall notify the applicant of his approval and, when such applicant has installed such system, in full compliance with the approval thereof, the commissioner shall issue a permit for such discharge, or (D) the proposed system to treat such discharge, as described by the plans and specifications, will not protect the waters of the state, in which case he shall promptly notify the applicant that its application is denied and the reasons therefor. . . . The commissioner shall, by regulations adopted in accordance with the provisions of chapter 54, establish procedures, criteria and standards as appropriate for determining if (I) a discharge would cause pollution to the waters of the state, and (II) a treatment system is adequate to protect the waters of the state from pollution. Such procedures, criteria and standards may include schedules of activities, prohibitions of practices, operating and maintenance procedures, management practices and other measures to prevent or reduce pollution of the waters of the state, provided the commissioner in adopting such procedures, criteria and standards shall consider best management practices. The regulations shall specify the circumstances under which procedures, criteria and standards for activities other than treatment will be required. For the purposes of this section, 'best management practices' means those practices which reduce the discharge of waste into the waters of the state and which have been determined by the commissioner to be acceptable based on, but not limited to, technical, economic and institutional feasibility. Any applicant, or in the case of a permit issued pursuant to the federal Water Pollution Control Act, any person or municipality, who is aggrieved by a decision of the commissioner

agree with the trial court's conclusion that the plaintiffs

where an application has not been given a public hearing shall have the right to a hearing and an appeal therefrom in the same manner as provided in sections 22a-436 and 22a-437. Any applicant, or in the case of a permit issued pursuant to the federal Water Pollution Control Act, any person or municipality, who is aggrieved by a decision of the commissioner where an application has been given a public hearing shall have the right to appeal as provided in section 22a-437. The commissioner may, by regulation, exempt certain categories, types or sizes of discharge from the requirement for notice prior to approving or denying the application if such category, type or size of discharge is not likely to cause substantial pollution. The commissioner may hold a public hearing prior to approving or denying any application if in his discretion the public interest will be best served thereby, and he shall hold a hearing upon receipt of a petition signed by at least twenty-five persons. Notice of such hearing shall be published at least thirty days before the hearing in a newspaper having a substantial circulation in the area affected.

"(c) The permits issued pursuant to this section shall be for a period not to exceed five years, except that any such permit shall be subject to the provisions of section 22a-431. Such permits: (1) Shall specify the manner, nature and volume of discharge; (2) shall require proper operation and maintenance of any pollution abatement facility required by such permit; (3) may be renewable for periods not to exceed five years each in accordance with procedures and requirements established by the commissioner; and (4) shall be subject to such other requirements and restrictions as the commissioner deems necessary to comply fully with the purposes of this chapter, the federal Water Pollution Control Act and the federal Safe Drinking Water Act. An application for a renewal of a permit which expires after January 1, 1985, shall be filed with the commissioner at least one hundred eighty days before the expiration of such permit. The commissioner, at least thirty days before approving or denying an application for renewal of a permit, shall publish once in a newspaper having substantial circulation in the area affected, notice of (A) the name of the applicant; (B) the location, volume, frequency and nature of the discharge; (C) the tentative decision on the application, and (D) such additional information the commissioner deems necessary to comply with the federal Clean Water Act (33 USC 1251 et seq.). There shall be a comment period following the public notice during which period interested persons and municipalities may submit written comments. After the comment period, the commissioner shall make a final determination that (i) continuance of the existing discharge would not cause pollution of the waters of the state, in which case he shall renew the permit for such discharge, or (ii) continuance of the existing system to treat the discharge would protect the waters of the state from pollution, in which case he shall renew a permit for such discharge, (iii) the continuance of the existing system to treat the discharge, even with modifications, would not protect the waters of the state from pollution, in which case he shall

lack standing under § 22a-16 to bring their claim directly

promptly notify the applicant that its application is denied and the reasons therefor, or (iv) modification of the existing system or installation of a new system would protect the waters of the state from pollution, in which case he shall renew the permit for such discharge. Such renewed permit may include a schedule for the completion of the modification or installation to allow additional time for compliance with the final effluent limitations in the renewed permit provided (I) continuance of the activity producing the discharge is in the public interest; (II) the interim effluent limitations in the renewed permit are no less stringent than the effluent limitations in the previous permit; and (III) the schedule would not be inconsistent with the federal Water Pollution Control Act. No permit shall be renewed unless the commissioner determines that the treatment system adequately protects the waters of the state from pollution. Any applicant, or in the case of a permit issued pursuant to the federal Water Pollution Control Act, any person or municipality, who is aggrieved by a decision of the commissioner where an application for a renewal has not been given a public hearing shall have the right to a hearing and an appeal therefrom in the same manner as provided in sections 22a-436 and 22a-437. Any applicant, or in the case of a permit issued pursuant to the federal Water Pollution Control Act, any person or municipality, who is aggrieved by a decision of the commissioner where an application for a renewal has been given a public hearing shall have the right to appeal as provided in section 22a-437. Any category, type or size of discharge that is exempt from the requirement of notice pursuant to subsection (b) of this section for the approval or denial of a permit shall be exempt from notice for approval or denial of a renewal of such permit. The commissioner may hold a public hearing prior to approving or denying an application for a renewal if in his discretion the public interest will be best served thereby, and he shall hold a hearing upon receipt of a petition signed by at least twenty-five persons. Notice of such hearing shall be published at least thirty days before the hearing in a newspaper having a substantial circulation in the area affected.

"(d) If the commissioner finds that any person or municipality has initiated, created or originated or is maintaining any discharge into the waters of the state without a permit as required in subsection (a) hereof, or in violation of such a permit, he may issue an order to abate pollution which shall include a time schedule for the accomplishment of the necessary steps leading to the abatement of such pollution, or notwithstanding any request for a hearing pursuant to section 22a-436 or the pendency of an appeal therefrom, he may request the Attorney General to bring an action in the superior court for the judicial district of Hartford to enjoin such discharge by such person or municipality until the person or municipality has received a permit from the commissioner or has complied with a permit which the commissioner has issued pursuant to this section. Any such action brought by the Attorney General shall have precedence in the order of trial as provided in section 52-191.

in the Superior Court. As we stated in *Fish II*, "[t]he plaintiffs . . . cannot use § 22a-16 as an 'open sesame' to litigate environmental issues that are governed by § 22a-430, and which clearly have been placed within the exclusive domain of the department. *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 597." *Fish II*, supra, 254 Conn. 34.

The plaintiffs claim that we should reevaluate our present interpretation of § 22a-16 with respect to actions brought pursuant to the licensing statutes, because the dissent in *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 170, 788 A.2d 1158 (2002) (*Borden, J.*, dissenting), suggests that the time has arrived for this court to revisit the *Middletown* holding. We disagree.

The dissent in *Nizzardo* raised the question of whether standing under § 22a-16 had been construed too narrowly in *Middletown*, stating that "it was self-contradictory to hold, as we did in *Middletown*, that one has standing under § 22a-16 to raise environmental concerns only under [CEPA] itself, and that, when one attempts to bring such an independent action, one has no standing to do so. In other words, it is difficult to see why the action that was held to be without standing in *Middletown* was not an action under [CEPA] itself. The majority [in *Nizzardo*], in relying on and reaffirming the holding of *Middletown*, does not explain this self-contradiction." *Nizzardo* v. *State Traffic Commission*, supra, 259 Conn. 195 (*Borden, J.*, dissenting).

The majority in *Nizzardo* concluded, and we continue to maintain, that the claim in *Middletown* was

"(e) When the commissioner determines that any person or municipality has complied with an order issued pursuant to section 22a-428, 22a-431 or 22a-432, he may issue a permit which shall thereafter be deemed equivalent to a permit issued under subsection (b) of this section, provided a public hearing shall not be required prior to issuing such permit unless required by the federal Water Pollution Control Act and the federal Safe Drinking Water Act. . . ."

brought under the licensing statutes. Id., 152–53. Indeed, it was precisely *because* the plaintiffs claimed that the defendants had failed to obtain required permits that we were persuaded in *Middletown* that the plaintiffs lacked standing under § 22a-16. *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 596.

Moreover, construing the plaintiffs' claim of an invalid permit and emergency authorization as an independent claim of unreasonable pollution under § 22a-16 would effectively remove from the department and give to the court the department's authority under § 22a-430 to make decisions regarding permit applications. It is not our function to take such a step; that determination rests with the legislature.

The plaintiffs next contend that the commissioner has instituted numerous actions pursuant to § 22a-16 in which this court has held that unlawful activities that occur in the absence of permits or in violation of statutes, regulations and abatement orders create unreasonable pollution under CEPA. See *Keeney* v. *Old Saybrook*, 237 Conn. 135, 140–41, 676 A.2d 795 (1996) (claim alleged unreasonable pollution of state waters for town's failure to comply with pollution abatement orders); *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 190, 629 A.2d 1116 (1993) (claim alleged unreasonable pollution for failure to obtain permit for operation of solid waste facility that generated leachate, thereby degrading groundwater); *Keeney* v. *L & S Construction*, 226 Conn. 205, 209, 626 A.2d 1299 (1993) (claim alleged unreasonable pollution for depositing construction debris in close proximity to area water supply in absence of permit). In the cases cited by the plaintiffs, however, the claims of unreasonable pollution were directed primarily to the polluting activity itself, and not, as here, to the validity of an existing permit or

authorization, a condition that does *not* directly threaten the public trust in the air, water and other natural resources of the state under § 22a-16.

We stated in *Keeney* v. *Old Saybrook*, supra, 237 Conn. 161, which the plaintiffs themselves cite, that "to establish a prima facie case under § 22a-16, the plaintiff must establish that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute . . . the public trust in the . . . water of the state." (Internal quotation marks omitted.) Allegations of a flawed licensing proceeding do not meet that test.[20] As the defendants persuasively argue, a claim under CEPA that conduct causes unreasonable pollution is not the same as a claim that conduct fails to comply with the requirements of

---

[20] An even more compelling example of the difference between a permitting claim and a claim of unreasonable pollution under § 22a-16 can be found in *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 1, 756 A.2d 262 (2000) (*Fish I*). All of the parties in *Fish I* were parties in *Fish II*, and several, including STAR Foundation, North Fork Environmental Council, New York Assemblyman Fred Thiel and Northeast, are also parties in the present case.

The plaintiffs in *Fish I* sought to enjoin the defendants from restarting unit 2, one of the three nuclear generating units in the Millstone facility, because the once-through condenser cooler water system in place at unit 2 allegedly had caused " 'unreasonable pollution, impairment and destruction of the public trust in the air, water and other natural resources of the state within the meaning of . . . General Statutes § 22a-16.' " *Fish I*, supra, 254 Conn. 3, 8. The plaintiffs' request for relief was based on allegations that the system contributed significantly to "the virtual demise of the winter flounder population in the Niantic River, and to the serious depletion of other aquatic species that are entrained and impinged at the unit 2 intake structure." Id., 8–9. The plaintiffs thus sought not only to enjoin the restart of unit 2, but to require conversion of the once-through cooling system to a closed cooling system and the installation of a fish return system to reduce the alleged environmental damage. Id., 9–10. The plaintiffs in *Fish I* therefore made a claim of conduct with direct environmental consequences, unlike the plaintiffs in the present case, whose claim of unreasonable pollution is based on the fact that the facility is operating without a valid water discharge permit and emergency authorization.

other environmental statutes.[21] To illustrate the point, the fact that conduct may be permitted under the relevant environmental statute does not preclude a claim that the activity causes unreasonable pollution under CEPA, as when the alleged pollution exceeds the amount approved in the permit. Conversely, a claim that conduct is not properly authorized does not necessarily establish that the conduct causes unreasonable pollution under CEPA. Accordingly, the issues raised in the cases cited by the plaintiffs are different in kind from the issue raised here.

The plaintiffs also attempt to draw a distinction between the claim of unreasonable pollution in *Fish II* and their present claim of unreasonable pollution. They assert that the claim in *Fish II* related to the validity of the permit, whereas the claim in this case alleges serious "ongoing pollution" that is unlawful because it is "unpermitted." We do not agree that the present claim of "ongoing pollution" differs in any significant respect

[21] The plaintiffs argue that *Waterbury* v. *Washington*, 260 Conn. 506, 800 A.2d 1102 (2002), established that, under CEPA, pollution is "unreasonable" when it is illegal. In *Waterbury*, we stated: "[W]hen, as in the present case . . . the legislature has enacted an environmental legislative and regulatory scheme specifically designed to govern the particular conduct that is the target of the action, that scheme gives substantive content to the meaning of the word 'unreasonable' as used in the context of an independent action under CEPA. Put another way, when there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes an unreasonable impairment under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme." Id., 557. We do not agree with the plaintiffs that the quoted language can be construed to support their claim that they have standing under § 22a-16 to bring the present action. The "conduct" to which we referred in *Waterbury* involved the diversion of waters from a river, which had a direct effect on the environment. Here, the claim of unreasonable pollution is based on allegations that Millstone is operating without a valid permit and emergency authorization, a claim of improper conduct under the licensing statutes that does not directly threaten the environment. The alleged improprieties in the present case were, therefore, not the type of conduct that we were contemplating when we decided *Waterbury*.

from the claim in *Fish II* of an invalid permit. The plaintiffs in this case always have characterized their claim of "ongoing pollution" as a claim of unreasonable pollution on the ground that Millstone has been operating without a valid permit and emergency authorization.[22] Moreover, the claim of "ongoing pollution" cannot be considered in isolation, because it would not, without more, be actionable under § 22a-16, which allows claims to be brought only for protection from *"unreasonable* pollution . . . ." (Emphasis added.) General Statutes § 22a-16. Accordingly, we reject the argument that the claim of unreasonable pollution in *Fish II* is distinguishable from the claim of "ongoing" unreasonable pollution in the present case.

The plaintiffs next contend that they have standing to bring their claim under § 22a-16 because the legislature contemplated that issues of pollution in violation of the public trust might implicate regulatory or administrative proceedings. They argue that, pursuant to General Statutes § 22a-18, the court may, but need not, remand the parties to administrative, licensing or other proceedings to determine the legality of the defendants' conduct. The Superior Court thus is empowered to determine the legality of that conduct, separate and apart from the agency's own proceedings. We do not agree that the plaintiffs' have standing to raise their claim of an invalid permit pursuant to §§ 22a-16 and 22a-18.

---

[22] The plaintiffs state in their brief that their claim of "unreasonable and lawless pollution" is alleged in paragraphs eight, nine, ten, sixteen, seventeen, twenty-four, twenty-six, twenty-eight, twenty-nine, thirty and thirty-nine of the complaint. Those paragraphs include allegations of the polluting activity (eight, nine, and ten), allegations that the 1992 permit has expired (sixteen and seventeen), allegations that the emergency authorization is invalid (twenty-four, twenty-six and twenty-eight through thirty) and allegations that Millstone operations involve conduct that has, or is reasonably likely to have, the effect of unreasonably polluting the natural resources of the state (thirty-nine).

General Statutes § 22a-18 provides in relevant part: "(b) If administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, the court *in its discretion* may remand the parties to such proceedings. . . ."[23] (Emphasis added.) We interpreted § 22a-16 in conjunction with § 22a-18 in *Waterbury* v. *Washington*, 260 Conn. 506, 800 A.2d 1102 (2002). In that case, the plaintiff city of Waterbury brought an action seeking a judgment declaring, inter alia, that it had not unreasonably

[23] General Statutes § 22a-18 provides: "(a) The court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction.

"(b) If administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, the court in its discretion may remand the parties to such proceedings. In so remanding the parties the court may grant temporary equitable relief where necessary for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction and the court shall retain jurisdiction of the action pending completion of administrative action for the purpose of determining whether adequate consideration by the agency has been given to the protection of the public trust in the air, water or other natural resources of the state from unreasonable pollution, impairment or destruction and whether the agency's decision is supported by competent material and substantial evidence on the whole record.

"(c) If the agency's consideration has not been adequate, and notwithstanding that the agency's decision is supported by competent material and substantial evidence on the whole record, the court shall adjudicate the impact of the defendant's conduct on the public trust in the air, water or other natural resources of the state in accordance with sections 22a-14 to 22a-20, inclusive.

"(d) Where, as to any administrative, licensing or other proceeding, judicial review thereof is available, the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review.

"(e) The court may award any person, partnership, corporation, association, organization or other legal entity which maintains an action under section 22a-16 or intervenes as a party in an action for judicial review under section 22a-19, and obtains declaratory or equitable relief against the defendant, its costs, including reasonable costs for witnesses, and a reasonable attorney's fee."

polluted, impaired or destroyed the public trust, as provided in § 22a-16, by diverting water from the Shepaug River pursuant to a 1921 agreement with the town of Washington to increase Waterbury's public water supply. Id., 511–12. The defendants counterclaimed, alleging, inter alia, that the city's excessive diversion of the water had violated the act and breached the 1921 agreement. Id., 511, 522. The trial court found for the defendants on their counterclaim. Id., 519. The city appealed, asserting that the trial court lacked subject matter jurisdiction over the water diversion claim because the defendants had failed to exhaust their administrative remedies under the "minimum flow statutes," General Statutes §§ 26-141a through 26-141c. Id., 525.

On appeal, the city argued that the defendants' complaint was premised on the lack of flow in the Shepaug River and that, because the rate of flow is governed by the minimum flow statute, which is enforced by the department, the defendants were precluded under our holdings in *Middletown, Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 1, 756 A.2d 262 (2000) (*Fish I*), and *Fish II* requiring exhaustion of administrative remedies from bringing their action to the court until the department had addressed the issue. *Waterbury* v. *Washington*, supra, 260 Conn. 528, 538. We nonetheless concluded in *Waterbury* that, under § 22a-18, the court *may, in its discretion,* remand the parties to administrative proceedings that might be available to determine the legality of a defendant's conduct, and that the defendants need *not* exhaust their administrative remedies before bringing an independent action in the Superior Court pursuant to § 22a-16. Id., 537, 545. We also stated that, under the doctrine of "primary jurisdiction, which is embodied by § 22a-18 of CEPA, the court has discretion, and in certain cases should refer the case, or certain aspects of it, to the administra-

tive agency, yet retain jurisdiction for further action, if appropriate, under that section."[24] Id., 546.

The present case is distinguishable from *Waterbury*. In that case, the defendants' claim of excessive diversion of water was an allegation of direct harm to the environment. The court specifically observed: "To resolve the question of whether Waterbury's diversion of water from the Shepaug River violated CEPA, the trial court [would be] required to determine whether Waterbury's diversion was of such magnitude that it constituted, not merely an impairment, but an unreasonable impairment of the public trust in the river as a natural resource in violation of § 22a-16." Id., 522–23. Here, by contrast, the plaintiffs did not make an allegation of direct harm to the environment, but alleged

[24] We also discussed the matter of primary jurisdiction in *Fish I*, where the defendants had argued, in the alternative, that the plaintiffs' claims should be dismissed under that doctrine. See *Fish I*, supra, 254 Conn. 11 n.15. We stated in *Fish I* that "[t]he doctrine of primary jurisdiction . . . arises in cases in which a plaintiff, in the absence of a pending administrative proceeding, invokes the original jurisdiction of the court. . . . In this case, [the plaintiff] has intervened in the defendants' permit renewal proceeding before the department . . . [B]ecause an administrative action is pending, the primary jurisdiction doctrine does not apply." (Citations omitted.) We subsequently declared in *Waterbury* that "[p]rimary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. . . . [A] court may not refer a controversy within its jurisdiction to an agency under this doctrine where the agency itself lacks jurisdiction; the court's jurisdiction in such cases is exclusive." (Citation omitted; internal quotation marks omitted.) *Waterbury* v. *Washington*, supra, 260 Conn. 574. Accordingly, primary jurisdiction may be retained by the court, even after it decides to remand a case for administrative proceedings. Id., 546. The *Waterbury* court thus overruled *Fish I* to the extent that *Fish I* had been based on the exhaustion theory. The *Waterbury* ruling and the theory of primary jurisdiction are not relevant in the present context, however, because the claim here, unlike the claims in *Fish I* and *Waterbury*, is a permitting claim under § 22a-430, and cannot be brought pursuant to § 22a-16 as a claim of environmental pollution.

unlawful and unreasonable pollution on the ground that Millstone is operating without a valid permit and emergency authorization. Under the reasoning in *Middletown* and *Fish II*, that claim cannot be brought directly in the Superior Court because it is a permitting claim. Accordingly, the plaintiffs cannot prevail on their argument that §§ 22a-16 and 22a-18 provide them with standing to bring their action directly in the Superior Court, as claims brought under the licensing statutes do not involve conduct that directly causes pollution.

In reaching this conclusion, we note that, in *Waterbury*, we agreed with the plaintiff's characterization of our decisions in *Middletown*, *Fish I* and *Fish II* as being based on a theory of exhaustion of administrative remedies.[25] *Waterbury* v. *Washington*, supra, 260 Conn. 538–39. After describing those cases as implicating the exhaustion doctrine, we held in *Waterbury* that, to the extent that the *Waterbury* holding conflicted with our previous decisions applying the exhaustion doctrine to an independent action under § 22a-16, namely, *Middletown*, *Fish I* and *Fish II*, we overruled them. Id., 545.

We now clarify our decision in *Waterbury* to recognize that *Middletown* and *Fish II* involved claims that the plaintiffs lacked standing because the court did not have jurisdiction "to litigate environmental issues that are governed by § 22a-430, and which clearly have been placed within the exclusive domain of the department."[26] *Fish II*, supra, 254 Conn. 34; *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 597. We

---

[25] We expressly stated that in *Middletown* and *Fish II* "we concluded that, pursuant to the doctrine of exhaustion of administrative remedies, the defendants were required to bring their claims to the administrative bodies entrusted with enforcement of the environmental statutes on which their claims were based." *Waterbury* v. *Washington*, supra, 260 Conn. 538–39.

[26] In *Fish II*, we stated: "In light of the conclusion that the plaintiffs lacked standing to bring their claim directly in the Superior Court, we do not reach the issue of exhaustion of administrative remedies." *Fish II*, supra, 254 Conn. 30 n.10.

also note, however, that *Waterbury* properly characterized our ruling in *Fish I* as based on the exhaustion doctrine. In *Fish I*, we concluded that the trial court should have dismissed the case for lack of standing under § 22a-16 and remanded the matter to the department for an initial determination before bringing their action to the court, because the department had authority to grant the requested injunctive relief during the permit renewal proceeding in which Fish Unlimited had intervened. *Fish I*, supra, 254 Conn. 17, 21.

Although this clarification does not affect our holding in *Waterbury* that the exhaustion doctrine does not apply where the legislature determines that a court may exercise jurisdiction pursuant to § 22a-16, despite the availability of administrative procedures, there must be no possible confusion as to our reasoning in *Middletown* and *Fish II*, because we rely on those two cases as precedent in the current matter.[27]

With each new case, we have continued to refine the law on standing under § 22a-16. We have determined that a plaintiff has standing to bring an independent action under § 22a-16 where an administrative body does not have jurisdiction to consider the environmental issues raised by the parties. See *Connecticut Fund for the Environment, Inc.* v. *Stamford*, supra, 192 Conn. 250; *Connecticut Water Co.* v. *Beausoleil*, 204 Conn. 38, 46, 526 A.2d 1329 (1987); *Nizzardo* v. *State Traffic Commission*, supra, 259 Conn. 155; *Fort Trumbull Conservancy, LLC* v. *Alves*, supra, 262 Conn. 486–87. We also have concluded that where an administrative body has been granted authority to adjudicate conduct with adverse environmental effects, the exhaustion doctrine does not apply. See *Waterbury* v. *Washington*, supra, 260 Conn. 537. In cases such as *Waterbury*, an indepen-

---

[27] We take no issue with the characterization in *Waterbury* of our ruling on standing in *Fish I* as based on the exhaustion doctrine.

dent action may be brought directly in the Superior Court, but the court has discretion to retain jurisdiction and remand the matter for administrative proceedings. Id., 546. Where the alleged conduct involves a permitting claim, however, there is no standing pursuant to § 22a-16 to bring the claim directly in the Superior Court, and the claim must be resolved under the provisions of the appropriate licensing statutes. *Fish II*, supra, 254 Conn. 21; *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 591. The present claim falls within this last category.

Our conclusion that the plaintiffs lack standing to bring their claim under § 22a-16 is dispositive, and precludes our consideration of their remaining claims that the trial court improperly relied on the exhaustion doctrine and improperly conducted proceedings "prejudicial to the administration of justice." We do not reach the plaintiffs' claim that the trial court improperly denied their application for a temporary injunction for the same reason.

The appeal from the judgment dismissing the action against Northeast Nuclear Energy Company is dismissed; the judgment dismissing the action against the named defendant and the defendant Dominion Nuclear Connecticut, Inc., is affirmed.

In this opinion the other justices concurred.