NANCY BURTON *v.* DOMINION NUCLEAR
CONNECTICUT, INC.
(SC 18603)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh and Vertefeuille, Js.

Argued December 6, 2010—officially released April 19, 2011

*Nancy Burton*, pro se, the appellant (plaintiff).

*Elizabeth C. Barton*, with whom were *Harold M. Blinderman* and *Rene A. Ortega*, for the appellee (defendant).

*Opinion*

ZARELLA, J. The plaintiff, Nancy Burton, appeals from the judgment of the trial court dismissing her complaint and denying her application for a temporary restraining order on the ground that the court lacked subject matter jurisdiction. The plaintiff seeks to prevent the defendant, Dominion Nuclear Connecticut, Inc., which owns and operates the Millstone Nuclear Power Station (Millstone) in the town of Waterford, from implementing, or continuing to implement,[1] a 7 percent increase in electric power generating capacity (uprate)[2] in its Unit 3 nuclear reactor because the increase purportedly would cause unreasonable pollution by significantly increasing the discharge of radioactive waste[3] and raising the temperature of the cooling water released into Long Island Sound (thermal plume). On appeal, the plaintiff claims that the trial court improperly dismissed, for lack of standing, her complaint alleging (1) a cause of action under the Connecticut Environmental Protection Act (CEPA), General Statutes § 22a-1 et seq., (2) a claim of public nuisance,

---

[1] The defendant represents that the increase in power generating capacity was implemented following the trial court's decision on its motion to dismiss.

[2] An "uprate" is an increase in a power company's licensed power limit. See *Caldon v. Advanced Measurement & Analysis Group, Inc.*, 515 F. Sup. 2d 565, 570 (W.D. Pa. 2007).

[3] We consider allegations that the uprate will result in increased toxins, carcinogens and radioactive waste as a single allegation of an increase in radioactive waste because the complaint describes those substances as interacting synergistically to produce a single, harmful effect. See Plaintiff's Amended Complaint, para. 12 (alleging that "Millstone's toxic and radioactive effluents are carcinogens; interaction of toxins with radioisotopes produces a synergistic effect which may be more harmful to health than such substances are in the absence of said interaction").

(3) classical aggrievement,[4] and (4) a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110b (a). She also claims that, to the extent the trial court concluded that the doctrines of federal preemption, exhaustion of administrative remedies and primary jurisdiction provided additional grounds on which to dismiss her complaint, its conclusions were improper. The defendant responds that the trial court properly dismissed the complaint on jurisdictional grounds. We affirm the judgment of the trial court.

The following relevant facts and procedural history are set forth in the trial court's memorandum of decision. "On August 12, 2008, the [federal] Nuclear Regulatory Commission [commission] approved [the defendant's] license amendment request for a stretch power uprate of 7 percent at Millstone Unit 3. This uprate increased Millstone's licensed core power from 3411 megawatts thermal to 3650 megawatts thermal. The plaintiff . . . [had] petitioned to intervene in the uprate license amendment request proceeding. The [commission] appointed an atomic safety licensing board to rule on the plaintiff's petition, which was denied.

"The [commission's] decision to approve the license amendment request was supported by a 260 page safety evaluation report issued on August 12, 2008. The [commission] also performed an environmental evaluation of the impact of the uprate on the human environment. The results of this evaluation are reflected in an environmental assessment and finding of no significant impact published in the Federal Register on August 7, 2008. In it, the [commission] concluded that 'even with the small increase in the radioactivity being discharged into the

---

[4] We treat the plaintiff's claim of classical aggrievement as a separate issue because it is governed by distinct legal principles, even though the plaintiff did not present this claim as a separate count in her complaint but, rather, as one of the last allegations in the introductory portion of her complaint.

environment, the projected dose to the maximally exposed member of the public, while slightly increased . . . will remain well below the "as low as is reasonably achievable" . . . guide[lines]' established in the [commission's] regulations. Dominion Nuclear Connecticut, Inc.; Millstone Power Station, Unit 3; Final Environmental Assessment and Finding of No Significant Impact Related to the Proposed License Amendment to Increase the Maximum Reactor Power Level, 73 Fed. Reg. [46,056 (Nuclear Regulatory Commission August 7, 2008)].

"With respect to the nonradiological impacts of the thermal effluents from the [power] plant after the uprate, the [commission] determined that '[n]o effects on the aquatic or terrestrial habitat in the vicinity of the plant, or to endangered or threatened species, or to the habitats of endangered or threatened species are expected as a result of the increase in thermal discharge.' Id., 46,055. The environmental assessment concluded that issuance and implementation of the uprate will not have a significant effect on the quality of the human environment. Id., 46,057."

On October 23, 2008, the plaintiff filed her complaint,[5] seeking an injunction, damages and other relief on the ground that the uprate would cause unreasonable pollution to Long Island Sound and to an estuary located near property that she owns and uses seasonally. The plaintiff also filed an ex parte application for a temporary restraining order to preclude the defendant from implementing the uprate unless it could do so without increasing the discharge of radioactive waste into Long Island Sound and without increasing the temperature of the thermal plume.

The trial court scheduled a hearing on the application for a temporary restraining order for November 3, 2008.

---

[5] The amended complaint dated November 10, 2008, is the operative complaint for purposes of this appeal.

The defendant responded with a motion to dismiss the complaint and the application on the ground that the plaintiff lacked standing to bring her claims and, alternatively, on grounds of federal preemption, exhaustion of administrative remedies and primary jurisdiction.

On November 10, 2008, the trial court held a hearing on the motion to dismiss and, on January 7, 2009, granted the motion. The court dismissed the plaintiff's complaint for lack of standing and further concluded that the plaintiff's complaint was subject to dismissal on the basis of the doctrines of federal preemption, exhaustion of administrative remedies and primary jurisdiction. On January 20, 2009, the plaintiff filed a motion for reconsideration, which the trial court denied. This appeal followed.[6]

I

We begin with the defendant's claim that the plaintiff's request for injunctive relief should be dismissed as moot because Millstone implemented the uprate following the trial court's decision, and, therefore, no practical relief is available to the plaintiff. The plaintiff responds that the defendant relies on inapposite legal authority and that there is no evidence in the record to support the conclusion that, even if the uprate has been implemented, it cannot be reversed or "undone." (Internal quotation marks omitted.) We agree with the plaintiff that her request for injunctive relief should not be dismissed as moot.

"Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of

---

[6] The plaintiff appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Giaimo* v. *New Haven*, 257 Conn. 481, 492–93, 778 A.2d 33 (2001).

"Connecticut courts have rejected injunctive remedies on the ground of mootness where the issue before the court has been resolved or has lost its significance because of intervening circumstances. See *Waterbury Hospital* v. *Connecticut Health Care Associates*, 186 Conn. 247, 249–52, 440 A.2d 310 (1982) (court dismissed as moot plaintiff's request for injunctive relief to restrain picketing during strike because strike and picketing had ended while appeal was pending); *Daley* v. *Gaitor*, 16 Conn. App. 379, 381 n.2, 547 A.2d 1375 (court dismissed as moot plaintiff's request to enjoin city of Hartford from administering promotional examination to police officers following city's promotion of officers during pendency of appeal), cert. denied, 209 Conn. 824, 552 A.2d 430 (1988)." *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 126, 836 A.2d 414 (2003).

In the present case, the plaintiff does not dispute the defendant's contention that Millstone implemented the uprate following the trial court's decision. There is no evidence in the record, however, that this intervening circumstance prevents the court from affording the plaintiff any practical relief. In previous cases in which we have upheld the trial court's dismissal of claims for mootness, the reasons for requesting injunctive relief no longer existed at the time the appeal was decided.

See, e.g., id., 125–27 (request to prevent transfer of permits to future owner of power generating facility deemed moot because sale of facility was completed following trial court's decision and permits thus could not be transferred back to former owner); see also *Waterbury Hospital* v. *Connecticut Health Care Associates*, supra, 186 Conn. 250–52. In the present case, however, there is no evidence in the record that reversal of the uprate would not be feasible from a financial standpoint or that it would be technically difficult to achieve. The defendant stated at oral argument that the uprate was implemented by working with existing equipment to maximize power output and that no major construction or capital improvements were required. Accordingly, we cannot conclude, on the basis of the record before us, that the plaintiff's request for injunctive relief should be dismissed as moot.

## II

We next consider the plaintiff's claims that implementation of the uprate will cause unreasonable pollution by significantly increasing (1) the discharge of radioactive waste,[7] and (2) the temperature of the thermal plume. The trial court concluded, and the defendant agrees, that the plaintiff's claims should be dismissed on the ground that she lacks standing under various state statutes, the common law of public nuisance and principles of classical aggrievement and, alternatively, on grounds of federal preemption, exhaustion of administrative remedies and primary jurisdiction. We conclude that the trial court properly dismissed the plaintiff's claim regarding an increase in the discharge of radioactive waste because Congress has preempted state authority in this area. We also conclude that the court properly dismissed her claim regarding an increase in the temperature of the thermal plume for lack of standing.

---

[7] See footnote 3 of this opinion.

The standard of review is well established. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings." (Internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, 291 Conn. 789, 802, 970 A.2d 640 (2009).

"In ruling [on] whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 326, 780 A.2d 98 (2001). "If . . . the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed."[8]

___

[8] In *Conboy* v. *State*, 292 Conn. 642, 974 A.2d 669 (2009), we noted that, under federal law, the factors that a trial court must consider in deciding a jurisdictional question raised in a pretrial motion to dismiss depend on the state of the record at the time the motion is filed. See id., 650–51. The court may decide the motion on the basis of the complaint alone, on the basis of the complaint supplemented by undisputed facts established by affidavits or other types of undisputed evidence filed in support of the

*Warth* v. *Seldin*, 422 U.S. 490, 501–502, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); accord *Andross* v. *West Hartford*, 285 Conn. 309, 340, 939 A.2d 1146 (2008).

A

We first address the plaintiff's claim of unreasonable pollution caused by the increase in radioactive waste. "It is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms. . . . Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the [s]tates to supplement it, because the [a]ct of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. . . . Even [when] Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is

motion, or, when the facts are disputed, on the basis of an evidentiary hearing to establish jurisdictional facts. Id., 651–53. In the present case, the trial court held a hearing on the defendant's motion to dismiss, during which the parties reiterated their legal arguments, the plaintiff testified personally, the plaintiff's expert witness testified regarding the effects of radiation on human health, and both sides introduced several exhibits into evidence relating to the location of the plaintiff's property and various rulings by federal and state authorities on the defendant's application to increase its generating capacity. The trial court referred to the hearing in its memorandum of decision when it observed that the plaintiff had presented evidence that she makes recreational use of Long Island Sound for swimming and boating in support of her claim of classical aggrievement. Thus, to the extent necessary, this court likewise will rely on evidence presented at the hearing in determining whether the trial court properly dismissed the plaintiff's complaint for lack of standing.

a physical impossibility . . . or [when] state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Citations omitted; internal quotation marks omitted.) *Pacific Gas & Electric Co.* v. *Energy Resources Conservation & Development Commission*, 461 U.S. 190, 203–204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983); see also *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 70–71, 942 A.2d 345 (2008).

In *Pacific Gas & Electric Co.*, the United States Supreme Court stated that "Congress, in passing the 1954 [Atomic Energy] Act and in subsequently amending it, intended that the [f]ederal [g]overnment should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant, but that the [s]tates retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost, and other related state concerns." *Pacific Gas & Electric Co.* v. *Energy Resources Conservation & Development Commission*, supra, 461 U.S. 205. The court subsequently reiterated that "the [f]ederal [g]overnment maintains complete control of the safety and 'nuclear' aspects of energy generation . . . ." Id., 212; see also id., 212 n.24, citing *Northern States Power Co.* v. *Minnesota*, 447 F.2d 1143, 1151 (8th Cir. 1971) (federal government has sole authority to regulate radioactive waste release from nuclear power plants to exclusion of states), aff'd mem., 405 U.S. 1035, 92 S. Ct. 1307, 31 L. Ed. 2d 576 (1972); *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, supra, 286 Conn. 75. Accordingly, the trial court in the present case had no jurisdiction to consider the plaintiff's claim regarding the increase in radioactive waste because the federal government has exclusive regulatory authority over radiation hazards and safety as well as radiological discharges from

nuclear power plants. The trial court thus properly dismissed this claim.

The plaintiff argues that the United States Supreme Court decided in *Silkwood* v. *Kerr-McGee Corp.*, 464 U.S. 238, 250–52, 256–58, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984), that exceptions exist to the doctrine of federal preemption and that one such exception is a state tort action seeking punitive damages for injuries involving radiation. She therefore argues that Congress did not intend to preempt state tort remedies for injuries from exposure to hazardous nuclear materials and that she is allowed, under *Silkwood*, to maintain her common-law public nuisance action in state court. We disagree.

*Silkwood* involved an incident in which the employee of a nuclear power plant was accidentally exposed to plutonium, and, following her death shortly thereafter from an automobile accident, her estate sued the defendant company, seeking punitive damages for contamination to her person and property. Id., 241–43. In contrast, the plaintiff, in her public nuisance claim, does not allege a personal injury arising from an incident at a nuclear power plant but merely alleges that *she and other members of the public might be injured* at some future time from radioactive waste released into the environment, despite the fact that, according to the commission's environmental assessment, the amount of anticipated radioactivity fell well below the "as low as is reasonably achievable" guidelines established in the commission's regulations. (Internal quotation marks omitted.) Dominion Nuclear Connecticut, Inc.; Millstone Power Station, Unit 3; Final Environmental Assessment and Finding of No Significant Impact Related to the Proposed License Amendment to Increase the Maximum Reactor Power Level, supra, 73 Fed. Reg. 46,056.

Moreover, even if the plaintiff had alleged a nuclear *incident*, Congress enacted amendments to the Atomic

Energy Act in 1988; see Price-Anderson Amendments Act of 1988, Pub. L. No. 100-408, § 11 (a) and (b), 102 Stat. 1066, 1076, codified at 42 U.S.C. § 2014 (hh) and 2210 (n) (2) (2006); several years after *Silkwood* was decided, giving federal courts jurisdiction over public liability actions arising out of nuclear accidents and expressly providing for the removal of such actions from state to federal courts, even when only state law claims are asserted. See *Beneficial National Bank* v. *Anderson*, 539 U.S. 1, 6, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003) (noting that "federal courts [have] jurisdiction over tort actions arising out of nuclear accidents" and that removal of such actions brought in state court is provided for "even when they assert only state-law claims"); see also *El Paso Natural Gas Co.* v. *Neztsosie*, 526 U.S. 473, 484–85, 119 S. Ct. 1430, 143 L. Ed. 2d 635 (1999) (The Price-Anderson Act transforms into federal action "any public liability action arising out of or resulting from a nuclear incident . . . . The [a]ct not only gives a district court original jurisdiction over such a claim . . . but provides for removal to a federal court as of right if a putative Price-Anderson action is brought in a state court . . . . Congress thus expressed an unmistakable preference for a federal forum, at the behest of the defending party, both for litigating a Price-Anderson claim on the merits and for determining whether a claim falls under Price-Anderson when removal is contested." [Citations omitted; internal quotation marks omitted.]). Consequently, we reject the plaintiff's contention that she can maintain her common-law public nuisance action under the reasoning of *Silkwood*.

## B

We next consider the plaintiff's claim of unreasonable pollution caused by the increase in the temperature of the thermal plume. This claim, unlike the claim regarding radioactive waste, is not subject to dismissal on

the ground of federal preemption because it involves a nonradiological impact. See Dominion Nuclear Connecticut, Inc.; Millstone Power Station, Unit 3; Final Environmental Assessment and Finding of No Significant Impact Related to the Proposed License Amendment to Increase the Maximum Reactor Power Level, supra, 73 Fed. Reg. 46,055 (describing water use impact, including increase in temperature of water discharged from Millstone's Unit 3 reactor, as one of several nonradiological impacts). We thus consider whether the trial court properly dismissed this claim on the ground that the plaintiff lacked standing under CEPA, the common law of public nuisance, principles of classical aggrievement and CUTPA.

1

The plaintiff contends that the trial court improperly dismissed her claim because she lacks statutory standing under CEPA. We disagree.

"Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest. . . . Aggrievement does not demand certainty, only the possibility of an adverse effect on a legally protected interest. . . .

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation. . . .

"Traditionally, citizens seeking to protect the environment were required to show specific, personal aggrievement to attain standing to bring a legal action. . . . [CEPA] . . . however, waives the aggrievement requirement in two circumstances. First, any private party, including a municipality, without first having to establish aggrievement, may seek injunctive relief in court for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . . General Statutes § 22a-16. Second, any person or other entity, without first having to establish aggrievement, may intervene in any administrative proceeding challenging conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state. General Statutes § 22a-19 (a)." (Citations omitted; internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 128–29.

The plaintiff argues that she has statutory standing to bring her claim of unreasonable pollution under CEPA because she alleges a cognizable cause of action under § 22a-16. "Under § 22a-16, standing . . . is conferred only to protect the natural resources of the state from pollution or destruction. . . . Accordingly, all that is required to invoke the jurisdiction of the Superior Court under § 22a-16 is a colorable claim, by any person [or entity] against any person [or entity], of conduct resulting in harm to one or more of the natural resources of this state. . . . Although it is true, of course, that the plaintiff need not prove [his or her] case at this stage of the proceedings . . . the plaintiff nevertheless must articulate a colorable claim of unreasonable pollution, impairment or destruction of the environment. . . . A complaint does not sufficiently allege standing . . . by merely reciting the provisions of § 22a-16 . . . .

Rather, it must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Citations omitted; internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, supra, 291 Conn. 804.

We conclude that the plaintiff has failed to make a colorable claim sufficient to establish her standing under § 22a-16 because her complaint does not contain allegations of "*substantive* violations giving rise to unreasonable pollution"; (emphasis added) id., 808 n.15; that is, allegations of "pollution in excess of that permitted under the regulatory scheme . . . ." Id., 810–11 n.18; see also *Fort Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 808, 925 A.2d 292 (2007) ("[a] claim that the defendant has violated the *substantive* provisions of . . . a statute . . . may give rise to an inference that the conduct causes unreasonable pollution" [emphasis in original]); *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 141 ("the fact that conduct may be permitted under the relevant environmental statute does not preclude a claim that the activity causes unreasonable pollution under CEPA, as when the alleged pollution exceeds the amount approved in the permit"); *Waterbury* v. *Washington*, 260 Conn. 506, 557, 800 A.2d 1102 (2002) ("when there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes an unreasonable impairment under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme"). Specifically, the plaintiff's allegations do not support an inference that the increase in the temperature of the thermal plume will exceed the temperature permitted under the applicable legislative and regulatory scheme. The allegations merely state in the most generic terms that the uprate will elevate the tem-

perature of the thermal plume and thus cause harm to the environment.[9] In other words, the plaintiff's allega-

___

[9] The plaintiff's amended complaint contains the following allegations relating to her CEPA claim of unreasonable pollution caused by an increase in the temperature of the thermal plume: "9. When released, Millstone's cooling water is at measurably elevated temperatures above the temperature of the water when taken in at the Millstone intakes.

"10. Millstone's release of . . . thermal waste to the Long Island Sound has had a deleterious and measurable impact on the [marine life] and marine environment as well as serious consequences to human health.

"11. . . . [T]hermal effluents routinely released by Millstone are distributed along the Connecticut shoreline through tidal, wave and current activity.

\* \* \*

"13. The phenomenon of global warming, including warming of seawater, is widely believed to subject [marine life] to stress and may account for the departure of [marine life] species from areas where they were once indigenous; yet [the defendant's] plans to achieve an electricity uprate at Millstone Unit 3 have not adequately considered the influence of global warming on [marine life] concomitantly with its release of a hotter thermal plume.

"14. According to [the defendant's] own experts:

" 'Planktonic organisms are potentially affected by [the proposed temperature increase of the thermal plume] through plume entrainment as the [Millstone] thermal discharge mixes with ambient water masses, and nektonic and sessile or less mobile organisms by continuous or long-term residence in areas receiving the plume. Temperature is perhaps the most pervasive physical factor affecting aquatic organisms . . . . Exposure to increased water temperature from a thermal plume may cause, for example, stress or changes in natural processes such as swimming activity, respiration, feeding, physiology and metabolism, growth, reproduction and early development. . . . Migratory paths of adult fish may also be blocked by thermal plumes if large cross-sectional areas of the water column are impacted and thereby avoided because temperature exceeds thermal tolerances. . . . The rocky intertidal shoreline biota (algae and invertebrates) [remain] as the community most affected by the [Millstone] thermal plume.'

"15. [The defendant] intends shortly to increase the temperature of its thermal discharge from its Unit 3 nuclear reactor in order to achieve a 7 [percent] increase in electricity generation.

"16. [The defendant] estimates that its Unit 3 electricity uprate will result in a 7 [percent] increase in [British thermal units] released in the thermal plume.

\* \* \*

"18. The electricity to be generated by said uprate is excess electricity which is not needed in Connecticut.

"19. Much of the electricity generated at Millstone is exported [out of state] and produces no in-state benefit.

\* \* \*

"23. Paragraphs 1 through 22 are incorporated by reference herein. This action is brought pursuant to [CEPA], including . . . General Statutes § 22a-

tions are without the kind of substantive heft required under § 22a-16.[10] Moreover, the plaintiff neither filed an affidavit containing such allegations nor adduced evidence at the hearing on the motion to dismiss to remedy this defect; see *Conboy* v. *State*, 292 Conn. 642, 651–53, 974 A.2d 669 (2009); and the record before the trial court established that the commission had approved the defendant's power uprate request and had concluded in an environmental assessment that "[n]o effects on the aquatic or terrestrial habitat in the vicinity of the plant, or to endangered or threatened species, or to the habitats of endangered or threatened species are expected as a result of the increase in thermal discharge." Dominion Nuclear Connecticut, Inc.; Millstone Power Station, Unit 3; Final Environmental Assessment and Finding of No Significant Impact Related to the Proposed License Amendment to Increase the Maximum Reactor Power Level, supra, 73 Fed. Reg. 46,055. Accordingly, we conclude that the trial court properly dismissed the plaintiff's CEPA claim on the ground that she lacked standing.

The plaintiff asserts that she has statutory standing because her allegations of unreasonable pollution are virtually identical to the allegations that she made in *Burton* v. *Commissioner of Environmental Protection,*

16, to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction.

"24. [The defendant's] plan to significantly increase the temperature of its thermal plume release to the Long Island Sound is conduct which constitutes unreasonable pollution within the meaning of § 22a-16."

[10] In her reply brief, the plaintiff argues that the existing environmental legislative and regulatory scheme prohibits the Millstone discharge but that the trial court did not reach this issue because it dismissed the case for lack of standing. This argument is without merit because, in ruling on a motion to dismiss, the trial court must rely on the facts alleged in the complaint and all materials of record at that time, which, in the present case, did not include allegations concerning violations of the applicable legislative and regulatory scheme. See *Andross* v. *West Hartford*, supra, 285 Conn. 340.

supra, 291 Conn. 804, in which this court concluded that the allegations were sufficient "to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from Millstone's operation." We disagree.

Although we observed in *Burton* that "[t]he complaint contain[ed] specific allegations of harm to the marine life in the Long Island Sound, Niantic Bay and Jordan Cove, both through the discharge of contaminated and heated water into those bodies of water and through the 'entrainment and impingement' of marine organisms at the reactor intakes"; *Burton* v. *Commissioner of Environmental Protection*, supra, 291 Conn. 804–805; we further observed that "[t]he plaintiff *also* specifically alleged that the existing permit renewal proceeding [was] inadequate to protect the rights recognized by [CEPA] because the hearing officer [was] biased and the department [of environmental protection (department) had] prejudged the matter, thereby entitling her to judicial review of the proceeding under [General Statutes] § 22a-20. *In essence, therefore, the plaintiff allege[d] that, if the hearing officer and the department had fairly and impartially conducted the permit renewal proceeding, they would not have allowed [the defendant] to continue Millstone's operations under the emergency authorization or issued the tentative decision to renew the discharge permit* because the impact of the operations on the marine life in the neighboring bodies of water [was] more harmful than that permitted by the applicable regulatory scheme." (Emphasis added.) Id., 805. We thus determined in *Burton* that it was the allegations regarding inadequate administrative and regulatory procedures that formed the basis of the plaintiff's unreasonable pollution claim, a fact we reiterated later in that decision when we stated that the plaintiff was "claiming, pursuant to § 22a-20, that the permit renewal proceed-

ing [was] inadequate to protect the rights recognized by [CEPA]—the scope and contours of which are . . . defined by the permitting scheme itself—because the hearing officer and the department [had] not conducted the proceeding fairly and impartially. Thus, she [sought] to have the trial court enforce compliance with the existing statutory scheme . . . ." Id., 812. We ultimately concluded in *Burton* that the plaintiff had standing to bring an action pursuant to § 22a-16 on *regulatory* grounds, and we did not consider whether her allegations as to the effect of the contaminated and heated water on the environment, standing alone, were sufficient to support a claim of unreasonable pollution. Accordingly, because the plaintiff does not claim that there was any impropriety relating to the permit renewal proceeding or a violation of any other part of the regulatory scheme under which the defendant operates the facility, we conclude that *Burton* is inapposite, and the plaintiff's reliance on that case is misplaced.

2

The plaintiff next claims that the trial court improperly dismissed her claim alleging a public nuisance on the ground that she lacks standing. We disagree.

"Public nuisance law is concerned with the interference with a public right, and cases in this realm typically involve conduct that allegedly interferes with the public health and safety." *Pestey* v. *Cushman*, 259 Conn. 345, 357, 788 A.2d 496 (2002). "[A] plaintiff must prove four elements to succeed in a nuisance cause of action: (1) the condition complained of had a natural tendency to create danger and inflict injury [on] person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate

cause of the [plaintiff's] injuries and damages." (Internal quotation marks omitted.) Id., 355.

With respect to who may bring a public nuisance cause of action, "[i]t is uniformly held that that a private individual has no action for the invasion of the purely public right, unless his damage is in some way to be distinguished from that sustained by other members of the general public. It is not enough that he suffers the same inconvenience or is exposed to the same threatened injury as everyone else. Redress of the wrong to the community must be left to its appointed representatives. . . . There is general agreement on the requirement that the plaintiff's damage be different in kind, rather than in degree, from that shared by the general public . . . . One good reason for such a conclusion is the extreme difficulty of fixing any lines of demarcation in terms of degree of public damage . . . ." (Internal quotation marks omitted.) *Murphy* v. *EAPWJP, LLC*, 123 Conn. App. 316, 327–28, 1 A.3d 1171, cert. granted, 298 Conn. 930, 5 A.3d 489 (2010); see also *Truesdale* v. *Greenwich*, 116 Conn. 426, 431, 165 A. 201 (1933) (The right of private persons to injunctive relief cannot be maintained in absence of proof that they have "suffered substantial damage distinct from that sustained in common by the public, and special and peculiar to themselves . . . . This principle has long been recognized and acted [on] in this [s]tate, and very generally elsewhere."); *Edward Balf Co.* v. *Hartford Electric Light Co.*, 106 Conn. 315, 327, 138 A. 122 (1927) ("[a] private person cannot maintain an injunction against a public nuisance . . . unless he establishes that he has sustained a special or peculiar damage distinct from that which he suffers in common with the rest of the public"); Restatement (Second), Torts § 821C (1), p. 94 (1979) ("[i]n order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right

common to the general public that was the subject of interference").

In the present case, the plaintiff's allegations of harm caused by the elevated temperature of the thermal plume are insufficient for several reasons. First and foremost, they relate almost exclusively to the effect of the increased water temperature on wildlife, fish and other aquatic organisms, as opposed to members of the public who may use Long Island Sound and the estuary for recreational or other purposes. See footnotes 9 and 11 of this opinion. Second, they consist almost entirely of statements about the possible effect of global warming on marine life generally instead of on the marine life that inhabits Long Island Sound and the estuary. See id. Finally, the very few allegations that refer to the effect of the increased water temperature on persons who use Long Island Sound and the estuary fail to explain the nature of that harm or how the harm suffered by the plaintiff is special, distinct or different in kind from the harm suffered by other members of the public.[11] For example, although the plaintiff alleges

---

[11] Count two of the plaintiff's amended complaint contains the following allegations relating to her claim of public nuisance caused by an increase in the temperature of the thermal plume: "27. Paragraphs 1 through 26 are incorporated by reference herein.

"28. The pollution of the waters of the state is inimical to the public health, safety and is a public nuisance and is harmful to wildlife, fish and aquatic life and impairs recreational and other legitimate beneficial uses of water.

"29. [The defendant's] plan to significantly increase its thermal discharge and its discharge of carcinogens and radioactive waste to the Long Island Sound are conditions which have a natural tendency to create danger and inflict injury [on] persons or property; the danger is a continuing one; the use of the land for such purpose is unreasonable or unlawful and the condition or conduct complained of interferes with a right common to the general public.

"30. [The defendant's] plan to significantly increase the temperature of its thermal plume release to the Long Island Sound is conduct which constitutes a public nuisance pursuant to the common law of the state of Connecticut.

* * *

"32. By virtue of the defendant's conduct, the plaintiff is exposed to unnecessary and avoidable heightened risks to her health and [well-being], for which she seeks damages, punitive damages and injunctive relief."

in her brief that she will suffer from "diminished recreational enjoyment of an unhealthier Long Island Sound," which enjoyment presently consists of swimming, boating and the consumption of seafood, she did not allege in her complaint or adduce, at the hearing on the motion to dismiss; see *Conboy* v. *State*, supra, 292 Conn. 651–53; evidence demonstrating how her swimming, boating and consumption of seafood will be affected by the increased temperature of the thermal plume or how the diminution of her enjoyment of those activities will differ from that of the general public. Accordingly, we conclude that the trial court properly dismissed the plaintiff's claim of public nuisance on the ground that she lacked standing.

### III

The plaintiff next contends that the trial court improperly rejected her claim that she was classically aggrieved. We disagree.

As we previously noted, "[c]lassical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest." (Internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 128–29.

For all of the reasons set forth in part II of this opinion, we conclude that the plaintiff lacked a specific personal or legal interest in the allegedly unreasonable pollution caused by the increase in the temperature of the thermal plume. We thus conclude that the trial court properly rejected the plaintiff's claim that she was classically aggrieved.

## IV

The plaintiff finally contends that the trial court improperly dismissed her CUTPA claim on the grounds that she lacked standing and that CUTPA specifically exempts "[t]ransactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States . . . ." General Statutes § 42-110c (a) (1). We disagree.

This court has stated that, "[i]n order for a plaintiff to have standing, it must be a proper party to request adjudication of the issues. . . . One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Citations omitted; internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 347. "[I]f the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so." Id. We also have stated that "CUTPA, like other statutory and common-law claims, is subject to the remoteness doctrine as a limitation on standing." Id., 373; see also *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 88, 793 A.2d 1048 (2002) ("notwithstanding the broad language and remedial purpose of CUTPA, we have applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA").

We conclude that the plaintiff has failed to establish standing to bring her CUTPA claim because she does not allege harm from the increase in the temperature of the thermal plume that is not remote, indirect or derivative. Her principal allegation is that the elevated

temperature of the water will affect wildlife, fish and other aquatic organisms, which, in turn, will indirectly pose a danger to her health and affect her ability to enjoy her recreational pursuits of swimming, boating and consuming seafood from Long Island Sound and the estuary. She does not allege, however, precisely how her health will be endangered from the elevated temperature of the thermal plume or how her recreational pursuits will be affected; nor did she present evidence to that effect at the hearing on the motion to dismiss. See *Conboy* v. *State*, supra, 292 Conn. 651–53. Thus, without more specificity, it is impossible to conclude that the harm the plaintiff has alleged is direct. We therefore conclude that the trial court properly dismissed her claim of unreasonable pollution under CUTPA for lack of standing.

The judgment is affirmed.

In this opinion the other justices concurred.