******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

BERKSHIRE-LITCHFIELD ENVIRONMENTAL
COUNCIL, INC. *v.* DANIEL ESTY ET AL.*

Superior Court, Judicial District of Hartford
File No. LND CV-13-6041645-S
Memorandum filed July 9, 2014

*Proceedings*

Memorandum of decision on defendants' motion to dismiss. *Motion granted.*

*Nicholas J. Harding* and *Mary E. Mintel,* for the plaintiff.

*Kimberly P. Massicotte* and *Sharon M. Seligman,* assistant attorneys general, for the defendants.

*Opinion*

BERGER, J.

I

On April 25, 2013, the plaintiff, Berkshire-Litchfield Environmental Council, Inc.,[1] commenced this suit against the defendants; Daniel Esty, the Commissioner of the Department of Energy and Environmental Protection (commissioner); the Department of Energy and Environmental Protection (department); Susan Whalen, the Deputy Commissioner of the Department; and George C. Jepsen, the Attorney General; pursuant to General Statutes § 22a-16 of the Connecticut Environmental Protection Act (CEPA).[2] In the plaintiff's amended complaint filed on June 28, 2013, the plaintiff alleges that BNE Energy, Inc. (BNE), entered the state of Connecticut's Canaan Mountain Wilderness Natural Area Preserve[3] (the forest) on or about May 17, 2010, and clear-cut more than 332 trees on approximately 2.5 acres. On November 13, 2012, the commissioner entered into a consent order with BNE concerning remediation plans for the forest.[4] The plaintiff seeks a declaratory judgment rendering the consent order void because it alleges that the commissioner had no general statutory authority, including that set forth in General Statutes § 22a-6 (a) (3),[5] to enter into the consent order. In the alternative, the plaintiff seeks a declaratory ruling that the consent order must be revised to comply with General Statutes § 52-560a,[6] which it alleges would require referral of the matter to the attorney general and restoration of the forest by BNE.

On December 26, 2013, the defendants moved to dismiss and to strike the action on grounds that the court lacks subject matter jurisdiction because the plaintiff has no standing to bring the suit, or that if it does have standing, the suit should be stricken because the plaintiff has failed to state a cause of action against the defendants under CEPA. The defendants argue that the plaintiff lacks standing to bring this suit under CEPA because (1) CEPA does not provide for suits against parties that did not cause or participate in causing environmental damage; (2) CEPA cannot be used to force a third party to take some action, in this case, to require that the commissioner or the attorney general file suit against BNE; and (3) CEPA cannot be used to void a lawful consent order.

On February 13, 2014, the plaintiff filed a memorandum in opposition to the defendants' motion, arguing that the commissioner misunderstands its allegations. The plaintiff denies that it is requesting that the commissioner obtain injunctive relief to have BNE restore the state forest; rather, it argues that the commissioner only had the authority under § 52-560a to refer the matter to the attorney general. The plaintiff further asserts that the commissioner did not have the authority to enter

into the consent order either pursuant to §§ 22a-6 or 52-560a, and that, by entering into the order, he has prevented the plaintiff from pursuing an action against BNE for violation of CEPA. The plaintiff also argues that the commissioner, by entering into the order, has prevented the restoration of the state forest, thereby negatively impacting wildlife.

The defendants filed a memorandum in reply on March 13, 2014. They argue that no statute requires referral of the matter to the attorney general, the defendants' actions have not been illegal or impermissible, and the commissioner has broad authority to enter into a consent order. They also assert that the plaintiff lacks standing because it has failed to allege a substantive violation of environmental law or direct impairment or destruction of natural resources. This court heard argument on April 15, 2014.

## II

"A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 626, 79 A.3d 60 (2013).

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. . . .

"Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . .

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and

vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . .

"Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest. . . . Aggrievement does not demand certainty, only the possibility of an adverse effect on a legally protected interest. . . .

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation. . . .

"Traditionally, citizens seeking to protect the environment were required to show specific, personal aggrievement to attain standing to bring a legal action. . . . [CEPA] . . . however, waives the aggrievement requirement in two circumstances. First, any private party, including a municipality, without first having to establish aggrievement, may seek injunctive relief in court for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . . General Statutes § 22a-16. Second, any person or other entity, without first having to establish aggrievement, may intervene in any administrative proceeding challenging conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state. General Statutes § 22a-19 (a). . . .

"Under § 22a-16, standing . . . is conferred only to protect the natural resources of the state from pollution or destruction. . . . Accordingly, all that is required to invoke the jurisdiction of the Superior Court under § 22a-16 is a colorable claim, by any person [or entity] against any person [or entity], of conduct resulting in harm to one or more of the natural resources of this state. . . . Although it is true, of course, that the plain-

tiff need not prove [his or her] case at this stage of the proceedings . . . the plaintiff nevertheless must articulate a colorable claim of unreasonable pollution, impairment or destruction of the environment. . . . A complaint does not sufficiently allege standing [however] by merely reciting the provisions of § 22a-16 . . . . Rather, it must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Citations omitted; internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, 291 Conn. 789, 802–804, 970 A.2d 640 (2009).

### III

The defendants maintain that the plaintiff is improperly attempting to use CEPA to sue them instead of suing BNE for the destruction of the forest. The plaintiff posits, however, that it would be unsuccessful in suing BNE for violations of CEPA because of the preclusive effect of the consent order. See *Carothers* v. *Capozziello*, 215 Conn. 82, 95–96, 574 A.2d 1268 (1990) ("[a consent order], just like a stipulated judgment or consent decree, will be given preclusive effect to the same extent as a judgment or decree rendered after answer and contest" [internal quotation marks omitted]). The plaintiff's ability to sue BNE is, however, irrelevant to the issue of whether the plaintiff has standing. Specifically, the issue is whether the plaintiff's complaint "set[s] forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result"; (internal quotation marks omitted) *Burton* v. *Commissioner of Environmental Protection*, supra, 291 Conn. 804; from the defendants' conduct of entering into the consent order and failing to seek damages from BNE under § 52-560a.

### A

In count one in the plaintiff's amended complaint, it alleges the following:

"14. The red bad and the hoary bat are both species of Special Concern in Connecticut and both roost in dense forests . . . like those found in the Canaan Mountain Wilderness Natural Area Preserve."

"15. Neotropical migratory birds rely on large forest tracts . . . for breeding, including those on Canaan Mountain.

"16. There are approximately 200 species of Neotropical migratory birds; those that frequent the Canaan Mountain Wilderness Natural Area Preserve include: songbirds . . . and raptors . . . .

"17. In February 2011, a golden eagle was found near the Connecticut-New York border and it is now believed there may be at least one hundred more that spend the winter in northwestern Connecticut, residing on, or in

nearby or complimenting areas to, Canaan Mountain.

\*\*\*

"30. Though required by General Statutes § 52-560a, neither the Commissioner, nor the Deputy Commissioner, nor DEEP (collectively, the 'DEEP Defendants') has required BNE to restore the Clear-cut Area to the condition as it existed prior to BNE's decimation of the State Forest, or, in the alternative, has sought the costs of restoration, including reasonable management costs. Nor did the DEEP Defendants consider the willfulness of the violation, the extent of damage done to the natural resources, or the appraised value of the trees or shrubs cut in accordance with the statute.

"31. The DEEP Defendants did not seek any damages for the destruction of the natural resources or the appraised value of the trees or shrubs cut.

\*\*\*

"33. After confirming that BNE had clear cut the trees in the State Forest . . . the DEEP defendants should have referred the matter to the Attorney General for enforcement, as provided for in General Statutes § 52-560a.

"34. Instead of referring the matter to the Attorney General, the Deputy Commissioner entered into the consent order.

"35. The consent order erroneously claimed that the Commissioner had the authority to act under . . . § 52-560a.

\*\*\*

"37. Nothing in General Statutes §§ 22a-6 or 52-560a gives the DEEP Defendants authority to settle cases involving the destruction of the State Forest without the participation of the Attorney General or the Superior Court.

"38. Because of the lack of jurisdiction of the DEEP Defendants, as described above, the Deputy Commissioner did not have authority to sign the Consent Order, and the Consent Order is null and void.

"39. As a result of DEEP's failure to act in accordance with Connecticut law, which ensures the restoration of this valuable section of the State Forest that was illegally destroyed, the State has now lost a unique habitat that DEEP and the Attorney General are mandated by Connecticut law to protect.

\*\*\*

"46. As [General Statutes § 26-303 et seq.; 16 U.S.C. § 6101; 16 U.S.C. § 668] make clear, Connecticut values endangered and threatened species and essential habitats, and the United States has taken steps to protect Neotropical migratory birds and golden eagles, all of which have ties to the area on, or in nearby or compli-

menting areas to, Canaan Mountain, which the DEEP Defendants have failed and continue to fail to adequately protect and restore.

"47. The illegal actions of the DEEP Defendants have prevented the State Forest from being restored in accordance with General Statutes § 52-560a, and therefore the DEEP Defendants have unreasonably impaired or destroyed, and continue to unreasonably impair and destroy, the natural resources of the State of Connecticut and the public trust therein."

In count two, the plaintiff incorporates these paragraphs and further alleges: "47. The actions of the DEEP Defendants, both their incomplete investigation of BNE's actions and their refusal to follow the state policy outlined in § 52-560a that requires BNE to restore the State Forest to its natural state, unreasonably impaired or destroyed, and continue to unreasonably impair and destroy, the natural resources of the State of Connecticut and the public trust therein."

These allegations are insufficient to infer unreasonable harm to the environment caused by the defendants. "A complaint does not sufficiently allege standing . . . by merely reciting the provisions of § 22a-16 . . . . Rather, it must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Internal quotation marks omitted.) *Burton* v. *Dominion Nuclear Connecticut, Inc.*, 300 Conn. 542, 556–57, 23 A.3d 1176 (2011). The amended complaint clearly alleges that BNE clear-cut the forest and that the defendants did not take that action or permit it. The defendants' entering into the consent order and their failure to seek damages—or to refer the matter to have the attorney general seek damages—from BNE under § 52-560a did not cause the harm in this case. More importantly, the plaintiff does not allege any specific facts from which the court could infer how or why the consent order is causing any destruction[7] and is causing harm now to the threatened or endangered species; it simply concludes that the failure to seek restoration is the cause of the alleged harm. See *Fort Trumbull Conservancy, LLC* v. *Alves*, 286 Conn. 264, 273, 943 A.2d 420 (2008) ("[o]ur case law establishes that, to set forth a colorable claim under § 22a-16, the party seeking relief must provide an indication as to *how* or *why* [the challenged conduct] is likely to cause unreasonable harm to the environment" [emphasis altered; internal quotation marks omitted]); *Fort Trumbull Conservancy, LLC* v. *New London*, 265 Conn. 423, 433, 829 A.2d 801 (2003) ("In the present case, the allegations of the complaint do not give rise to an inference of unreasonable harm to the environment because it is not evident how the defendants' failure to follow certain procedural requirements in adopting the development

plan or to consider alternatives to the demolition of buildings in the Fort Trumbull area is likely to cause such harm. Nor is it apparent what the nature of any such harm might be.").

Construing the plaintiff's claim of an invalid consent order as a cause of action for unreasonable pollution under § 22a-16 would effectively strip the commissioner of the authority to enter into consent orders. See *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 139, 836 A.2d 414 (2003). "It is not our function to take such a step; that determination rests with the legislature." Id. Nevertheless, the plaintiff argues that the commissioner had no authority to issue the consent order[8] and that the only enforcement action allowed is that under § 52-560a.[9]

Section 52-560a (c) authorizes the owner of open space land, the holder of a conservation easement, or the attorney general to bring a suit in the Superior Court. Specifically, the statute provides that "the Attorney General *may* bring an action . . . ."[10] (Emphasis added.) "[T]he use of the term may . . . ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion." (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 310 Conn. 38, 47–48, 74 A.3d 1212 (2013). The plaintiff's assertion that the commissioner could only refer the matter to the attorney general under § 52-560a is an unduly rigid and unworkable construction of the statute and cannot be what the legislature intended. See *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 157, 788 A.2d 1158 (2002) ("[i]f two constructions of a statute are possible, we will adopt the one that makes the statute effective and workable" [internal quotation marks omitted]). Thus, the court cannot construe the statute to require anyone to bring a cause of action or to mandate that the commissioner refer the matter to the attorney general for enforcement.

The plaintiff also argues that by entering into the consent order rather than referring the matter to the attorney general to have the land restored, the commissioner has both "usurped the authority of the [a]ttorney [g]eneral" and has prevented the enforcement of, and failed to enforce, the Connecticut Endangered Species Act, General Statutes § 26-303 et seq.;[11] the Neotropical Migratory Bird Conservation Act; 16 U.S.C. § 6101;[12] and the 1940 Bald and Golden Eagle Protection Act, 16 U.S.C. § 668;[13] and to protect endangered or threatened species, including neotropical migratory birds and golden eagles, or essential habitats. Nothing in these statutes can be construed as preventing the commissioner from entering into a consent order.[14]

The commissioner entered into an order pursuant to his statutory power under § 22a-6 (a) (3). Section 22a-6, in relevant part, provides: "(a) The commissioner

may . . . (3) initiate and receive complaints as to any actual or suspected violation of any statute, regulation, permit or order administered, adopted or issued by him. *The commissioner shall have the power to* hold hearings, administer oaths, take testimony and subpoena witnesses and evidence, *enter orders* and institute legal proceedings including, but not limited to, suits for injunctions, for the enforcement of any statute, regulation, order or permit administered, adopted or issued by him . . . ." (Emphasis added.) Our courts have long been aware that the consent order is used by the commissioner to define parameters and obligations of operation as well as obligations and penalties for environmental violations. See, e.g., *Rocque* v. *Farricielli*, 269 Conn. 187, 848 A.2d 1206 (2004); *Walsh* v. *Stonington Water Pollution Control Authority*, 250 Conn. 443, 736 A.2d 811 (1999); *Water Pollution Control Authority* v. *Keeney*, 234 Conn. 488, 662 A.2d 124 (1995); *Waterbury* v. *Phoenix Soil, LLC*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-98-0146037-S (March 26, 2009) (*Cremins, J.*), aff'd, 128 Conn. App. 619, 20 A.3d 1 (2011); *Connecticut Resources Recovery Authority* v. *Dept. of Environmental Protection*, Superior Court, judicial district of Hartford, Docket No. CV-95-0544912-S (May 1, 1996) (*Hodgson, J.*); *Wright* v. *Woodridge Lake Sewer District*, Superior Court, judicial district of Litchfield, Docket No. CV-0043504-S (January 7, 1992) (*Susco, J.*). The consent order, issued pursuant to General Statutes §§ 22a-5, 22a-5a,[15] 22a-6, 23-5, and 23-5c, demonstrates the environmental policy for the preservation and maintenance of state land and forests.

Furthermore, the legislative scheme supports the commissioner's discretionary authority. In § 22a-5, the legislature provided that "[t]he commissioner shall carry out the energy and environmental policies of the state and shall have all powers necessary and convenient to faithfully discharge this duty. In addition to and consistent with the environment policy of the state, the commissioner shall (1) promote and coordinate management of water, land and air resources to assure their protection, enhancement and proper allocation and utilization; (2) provide for the protection and management of plants, trees, fish, shellfish, wildlife and other animal life of all types, including the preservation of endangered species; (3) provide for the protection, enhancement and management of the public forests, parks, open spaces and natural area preserves . . . ." In § 23-5, the legislature provided that " [t]he Commissioner of Energy and Environmental Protection shall have charge and supervision of all lands acquired by the state, as public reservations, for the purposes of public recreation or the preservation of natural beauty or historic association, except such lands as may be placed by law in the charge and under the supervision of other commissions or officials." In § 23-5c, the legis-

lature gave the "responsibility for selection, care, control, supervision and management of all natural area preserves within the system" to the commissioner with the obligation to "maintain such preserves in as natural and wild a state as is consistent with the preservation and enhancement of protected resources and educational, scientific, biological, geological, paleontological and scenic purposes. . . ." These statutes and especially § 22a-6 (a) (3) provide authority to order alternative remedies for environmental harm, particularly in light of the discretionary language of § 52-560a (c). Section 22a-6 (a) (3), in relevant part, provides that "[t]he commissioner shall have the power to . . . enter orders" and gives the commissioner a statutory avenue to address BNE's acts. The invasive species studies and passive growth management process fall within the legislature's grant of authority to the commissioner set forth in the statutes.[16]

The commissioner also argues that his administrative options to deal with the BNE violations are not circumscribed by § 52-560a; that is, it is not his sole enforcement tool.[17] He posits that the plaintiff has no standing to challenge his discretionary authority found within the terms of the consent order. Our Supreme Court has stated, "Agencies, in general, are given broad discretion to exercise their regulatory authority. . . . The United States Supreme Court has compared an agency's exercise of its enforcement power to that of a prosecutor. . . . In Connecticut, the legislature has granted the department broad discretion to enforce the environmental laws. . . . This court has held specifically that the department has the discretion to choose the appropriate enforcement action to remedy pollution." (Citations omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 670, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

This view is consistent with that of our federal courts. "This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. . . . This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement. The reasons for this general unsuitability are many. First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An

agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." (Citations omitted.) *Heckler* v. *Chaney*, 470 U.S. 821, 831–32, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985).

The commissioner has the discretion to utilize different statutory remedies available to him; a referral pursuant to § 52-560a (c) is but one possibility and not the only remedy. See, e.g., *Greenfield* v. *Reynolds*, 122 Conn. App. 465, 471–72, 1 A.3d 125 ("it is clear that the power to enforce zoning regulations conferred by [General Statutes] § 8-12 on town officials is discretionary"), cert. denied, 298 Conn. 922, 4 A.3d 1226 (2010). The commissioner also has the choice not to pursue a remedy under § 52-560a, but to enter into a consent order pursuant to § 22a-6 (a) (3), which, in this case, provides for the "passive restoration of the site through the regrowth of vegetation while controlling for invasive species."

Finally, the plaintiff's allegations most closely resemble an improper permitting claim. "In order to read our environmental protection statutes so as to form a consistent and coherent whole, we infer a legislative purpose that those other enactments are to be read together with CEPA, and that, when they apply to the conduct questioned in an independent action under CEPA, they give substantive content to the meaning of the word 'unreasonable' in the context of such an independent action." *Waterbury* v. *Washington*, 260 Conn. 506, 559, 800 A.2d 1102 (2002). As explained previously, authority to enter a consent order is part of the legislative scheme for environmental protection and as such should be construed under "the permitting process" rule of *Waterbury* v. *Washington*, supra, 506.

In *Rocque* v. *Mellon*, 275 Conn. 161, 168, 881 A.2d 972 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006), the court reviewed its decision in *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 116–18, 134, and stated that "[a]llegations of improper decisions by the commissioner for failure to comply with the statutory requirements regarding permit renewal proceedings and emergency authorizations cannot be construed as anything other than a licensing claim . . . . Relying on a long series of cases in which we had held that § 22a-16 does not confer standing to litigate permitting decisions that are within the exclusive jurisdiction of a state agency, we concluded that the trial court properly had dismissed the plaintiffs' claims. . . . In doing so, we distinguished other cases in which we had determined that the plaintiffs had standing under § 22a-16 because, although the lack of an appropriate permit had been alleged, the plaintiffs had raised independent claims of

unreasonable pollution [that] were directed primarily to the polluting activity itself, and not . . . to the validity of an existing permit or authorization . . . .” (Citations omitted; internal quotation marks omitted.) *Rocque* v. *Mellon*, supra, 168.

Similarly, in *Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 300 Conn. 545, the federal Nuclear Regulatory Commission approved an increase in the plaintiff’s licensed core power. The plaintiff alleged violation of CEPA, among other things, based upon unreasonable pollution caused by an increase in radioactive discharge and the temperature of the thermal plume. Id., 549. The court held that “the plaintiff has failed to make a colorable claim sufficient to establish her standing under § 22a-16 because her complaint does not contain allegations of . . . pollution in excess of that permitted under the regulatory scheme . . . .” (Citation omitted; internal quotation marks omitted.) Id., 557.

Thus, it is Connecticut law that “[w]here the alleged conduct involves a permitting claim . . . there is no standing pursuant to § 22a-16 to bring the claim directly in the Superior Court . . . .” *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 148. Standing exists, however, where the complaint contains “allegations of substantive violations giving rise to unreasonable pollution . . . that is, allegations of pollution in excess of that permitted under the regulatory scheme . . . .” (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 300 Conn. 557.

*Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 300 Conn. 542, in which the court held that the plaintiff lacked standing, must be distinguished from *Burton* v. *Commissioner of Environmental Protection*, supra, 291 Conn. 789, in which the court held that the plaintiff had standing. In *Burton* v. *Commissioner of Environmental Protection*, supra, 804–805, the Supreme Court concluded “that the plaintiff’s complaint adequately sets forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from Millstone’s operation. The complaint contains specific allegations of harm to the marine life in the Long Island Sound, Niantic Bay and Jordan Cove, both through the discharge of contaminated and heated water into those bodies of water and through the ‘entrainment and impingement’ of marine organisms at the reactor intakes. The plaintiff also specifically alleged that the existing permit renewal proceeding is inadequate to protect the rights recognized by the act because the hearing officer is biased and the department has prejudged the matter, thereby entitling her to judicial review of the proceeding under [General Statutes] § 22a-20. In essence, therefore, the plaintiff alleges that,

if the hearing officer and the department had fairly and impartially conducted the permit renewal proceeding, they would not have allowed Dominion to continue Millstone's operations under the emergency authorization or issued the tentative decision to renew the discharge permit because the impact of the operations on the marine life in the neighboring bodies of water is more harmful than that permitted by the applicable regulatory scheme."

In *Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 300 Conn. 557–59, the Supreme Court held that the plaintiff lacked standing because her allegations did "not support an inference that the increase in the temperature of the thermal plume will exceed the temperature permitted under the applicable legislative and regulatory scheme. The allegations merely state in the most generic terms that the uprate will elevate the temperature of the thermal plume and thus cause harm to the environment. In other words, the plaintiff s allegations are without the kind of substantive heft required under § 22a-16. Moreover, the plaintiff neither filed an affidavit containing such allegations nor adduced evidence at the hearing on motion to dismiss to remedy this defect." (Footnotes omitted.)

The allegations in the present case are unlike those in *Burton* v. *Commissioner of Environmental Protection*, supra, 291 Conn. 804–805. Here, the plaintiff does not allege bias, conflict of interest, or make any allegations regarding § 22a-20. Instead, as in *Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 300 Conn. 557–59, the plaintiff's allegations vaguely conclude that the defendants' failure to restore the forest pursuant to § 52-560a has unreasonably impaired or destroyed, and continues to unreasonably impair and destroy, the natural resources of the state. Ultimately, the plaintiff lacks standing because its allegations are without the substantive heft required by § 22a-16, and it has not filed an affidavit containing such allegations nor provided evidence at the hearing on the motion to dismiss to remedy this defect. See id., 557–59. Additionally, the plaintiff has not raised independent claims of unreasonable pollution that are directed primarily to the polluting activity itself, and instead focuses its claims on the validity of the consent order. See *Rocque* v. *Mellon*, supra, 275 Conn. 168. Furthermore, the plaintiff does not make allegations of pollution in excess of a regulatory scheme . See *Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 557. Therefore, the plaintiff has failed to make a colorable claim sufficient to establish its standing under § 22a-16.

### B

The attorney general also seeks individually to have this case dismissed. In the plaintiff's memorandum of law in opposition to the motion to dismiss on page three, it argues that, if the consent order is invalidated,

then the attorney general may decide within his discretion to bring a lawsuit. The plaintiff also asserts that the attorney general was named because it decided that he was a necessary party in light of the relief requested. Nevertheless, other than the allegation that the commissioner "should have referred the matter to the Attorney General for enforcement" under § 52-560a, nothing in the plaintiff's amended complaint suggests that the attorney general has violated any statute or failed to act in any way. For the reasons set forth previously, the motion to dismiss is also granted as to the attorney general.

Accordingly, the motion to dismiss is granted based upon lack of subject matter jurisdiction, and judgment is entered for the defendants.

* Affirmed. *Berkshire-Litchfield Environmental Council, Inc.* v. *Esty*, 162 Conn. App. 478,      A.3d      (2015).

[1] In paragraph forty of the plaintiff's amended complaint, it alleges that it is "a Connecticut nonprofit corporation with an office in North Canaan, Connecticut. [The plaintiff] is a science-based organization that focuses on environmental issues affecting the Northwest Corner of Connecticut and the Berkshire region of Massachusetts, including but not limited to Canaan Mountain, water and air contamination, zoning controls, vernal pools protection, good forestry practices, farmland protection, scenic ridgeline protection and inappropriate telecommunications tower siting."

[2] General Statutes § 22a-16, in relevant part, provides: "[A]ny person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ."

[3] In General Statutes § 23-5a, the legislature declared, "Connecticut is a state of relatively small area, undergoing rapid industrialization and rapid diminution of areas remaining in their natural condition. It is, therefore, declared to be the public policy that carefully selected areas of land and water of outstanding scientific, educational, biological, geological, paleontological or scenic value be preserved. In implementation of this policy, there is established a Connecticut system of natural area preserves."

[4] The consent order filed with the complaint (# 101.00) states that BNE entered an agreement with landowners adjacent to the forest to determine the feasibility of generating electricity by wind on the landowners' property. The consent order further states that BNE cut down trees relying on boundaries from a map prepared by a surveyor in 1987 for the department of agriculture, which was recorded on North Canaan's land records, and on a field survey that confirmed the boundaries of the 1987 map.

[5] General Statutes § 22a-6 (a), in relevant part, provides: "The commissioner may . . . (3) initiate and receive complaints as to any actual or suspected violation of any statute, regulation, permit or order administered, adopted or issued by him. The commissioner shall have the power to hold hearings, administer oaths, take testimony and subpoena witnesses and evidence, enter orders and institute legal proceedings including, but not limited to, suits for injunctions, for the enforcement of any statute, regulation, order or permit administered, adopted or issued by him . . . ."

[6] General Statutes § 52-560a provides: "(a) As used in this section, 'open space land' includes, but is not limited to, any park, forest, wildlife management area, refuge, preserve, sanctuary, green or wildlife area owned by the state, a political subdivision of the state or a nonprofit land conservation organization and 'encroach' means to conduct an activity that causes damage or alteration to the land or vegetation or other features thereon, including, but not limited to, erecting buildings or other structures, constructing roads, driveways or trails, destroying or moving stone walls, cutting trees or other vegetation, removing boundary markers, installing lawns or utilities, or using,

storing, or depositing vehicles, materials or debris.

"(b) No person may encroach or cause another person to encroach on open space land or on any land for which the state, a political subdivision of the state or a nonprofit land conservation organization holds a conservation easement interest, without the permission of the owner of such open space land or holder of such conservation easement or without other legal authorization.

"(c) Any owner of open space land or holder of a conservation easement subject to the provisions of subsection (b) of this section or the Attorney General may bring an action in the superior court for the judicial district where the land is located against any person who violates the provisions of said subsection with respect to such owner's land or land subject to such conservation easement. The court shall order any person who violates the provisions of subsection (b) of this section to restore the land to its condition as it existed prior to such violation or shall award the landowner the costs of such restoration, including reasonable management costs necessary to achieve such restoration. In addition, the court may award reasonable attorney's fees and costs and such injunctive or equitable relief as the court deems appropriate.

"(d) In addition to any damages and relief ordered pursuant to subsection (c) of this section, the court may award damages of up to five times the cost of restoration or statutory damages of up to five thousand dollars. In determining the amount of the award, the court shall consider the willfulness of the violation, the extent of damage done to natural resources, if any, the appraised value of any trees or shrubs cut, damaged, or carried away as determined in accordance with the latest revision of The Guide for Plant Appraisal, as published by the International Society of Arboriculture, Urbana, Illinois, or a succeeding publisher, any economic gain realized by the violator and any other relevant factors."

[7] To the contrary, the consent order requires BNE to have a new survey completed, establish a new boundary line, submit an invasive species monitoring and control plan through 2016, conduct an environmental research plan on the state parcel, and pay $10,000 for a supplemental environmental research project.

[8] The commissioner cited § 52-560a, as well as § 22a-6, as authority in the consent order. The commissioner acknowledges that § 52-560a does not authorize him to enter into a consent order, notwithstanding his reference to the statute. Nevertheless, standing is not conferred under CEPA as a result of a technical error. See *Fort Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 808, 925 A.2d 292 (2007) ("the mere allegation that a defendant has failed to comply with certain technical or procedural requirements of a statute imposing environmental standards does not, in and of itself, give rise to a colorable claim of unreasonable pollution under the act"); *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 141 n.21 ("Here, the claim of unreasonable pollution is based on allegations that Millstone is operating without a valid permit and emergency authorization, a claim of improper conduct under the licensing statutes that does not directly threaten the environment. The alleged improprieties in the present case were, therefore, not the type of conduct that we were contemplating when we decided *Waterbury* [v. *Washington*, 260 Conn. 506, 560, 800 A.2d 1102 (2002)]."); see also *Lewis* v. *Planning & Zoning Commission*, 275 Conn. 383, 393–94, 880 A.2d 865 (2005) (holding that plaintiff had no standing to challenge alleged flawed inland wetlands permit under § 22a-16 because claim of unreasonable pollution was predicated entirely on defect in permitting process and because no allegation sufficiently independent of permitting claim).

[9] The plaintiff argues that the statute was passed in 2006 in response to *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 149–50, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). In *Ventres*, the court concluded "that the court was not required to create and impose on the airport defendants a plan of its own to restore the land to its condition prior to the violation. Nor was it required to issue a general order to the airport defendants that they restore the land to its prior condition, which almost certainly would have led to additional litigation." Id.

[10] "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text

and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Buttermilk Farms, LLC* v. *Planning & Zoning Commission*, 292 Conn. 317, 328, 973 A.2d 64 (2009).

[11] General Statutes § 26-303 "declares it is a policy of the state to conserve, protect, restore and enhance any endangered or threatened species and essential habitat."

[12] In 16 U.S.C. § 6101, Congress found "that—(1) of the nearly 800 bird species known to occur in the United States, approximately 500 migrate among countries, and the large majority of those species, the neotropical migrants, winter in Latin America and the Caribbean but breed in Canada and the United States;

"(2) neotropical migratory bird species provide invaluable environmental, economic, recreational, and aesthetic benefits to the United States, as well as to the Western Hemisphere;

"(3) (A) many neotropical migratory bird populations, once considered common, are in decline, and some have declined to the point that their long-term survival in the wild is in jeopardy; and

"(B) the primary reason for the decline in the populations of those species is habitat loss and degradation (including pollution and contamination) across the species' range; and

"(4) (A) because neotropical migratory birds range across numerous international borders each year, their conservation requires the commitment and effort of all countries along their migration routes; and

"(B) although numerous initiatives exist to conserve migratory birds and their habitat, those initiatives can be significantly strengthened and enhanced by increased coordination."

[13] Congress provides in 16 U.S.C. § 668 (b), in relevant part, for civil penalties for "[w]hoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this [Act] [16 U.S.C. §§ 668 through 668d], shall take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle, commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this [Act] [16 U.S.C. §§ 668 through 668d], may be assessed a civil penalty by the Secretary of not more than $ 5,000 for each such violation. . . ."

[14] Inasmuch as the plaintiff may be trying to imply violation of the endangered species act, General Statutes §§ 26-310 (a) and (b), in relevant part, provide that "[e]ach state agency, in consultation with the commissioner, shall conserve endangered and threatened species and their essential habitats, and shall ensure that any action authorized, funded or performed by such agency does not threaten the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat designated as essential to such species, unless such agency has been granted an exemption as provided in subsection (c) of this section"; General Statutes § 26-310 (a); and that "[e]ach state agency responsible for the primary recommendation or initiation of actions on land or in aquatic habitats which may significantly affect the environment, as defined in section 22a-1c, shall ensure that such actions are consistent with the provisions of sections 26-303 to 26-312, inclusive, and shall take all reasonable measures to mitigate any adverse impacts of such actions on endangered or threatened species or essential habitat . . . ." General Statutes § 26-310 (b). According to § 26-310 (c) and (d), the secretary of the office of policy and management and the commissioner would review the environmental impact in determining violations and exemptions. Nevertheless, in the present case, the defendants did not take action or permit it and any alleged violation of the endangered species act is tenuous at best.

[15] General Statutes § 22a-5a provides: "Except as otherwise provided, whenever any section in this title authorizes the commissioner to order a person to abate, correct or remedy any violation, condition, pollution or potential source of pollution, such order may require investigation, study, data gathering or monitoring as the commissioner deems appropriate to assure that the violation, condition or pollution is abated, corrected or remedied."

[16] It is noted that if the commissioner could only refer the matter to the attorney general who, in turn, decided to bring a suit, the court would then need to hear evidence, presumably from the commissioner, on the appropriate remedy for restoration.

[17] Of course, "[i]t is well established that an administrative agency pos-

sesses no inherent power. Its authority is found in a legislative grant, beyond the terms and necessary implications of which it cannot lawfully function." (Internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, supra, 259 Conn. 155 (discussing jurisdictional limits of administrative agencies and *Connecticut Fund for the Environment* v. *Stamford*, 192 Conn. 247, 470 A.2d 1214 [1984]). Nevertheless, "we are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . Legislation never is written on a clean slate, nor is it ever read in isolation or applied in a vacuum. Every new act takes its place as a component of an extensive and elaborate system of written laws. . . . Construing statutes by reference to others advances [the values of harmony and consistency within the law]. In fact, courts have been said to be under a duty to construe statutes harmoniously where that can reasonably be done. . . . Accordingly, [i]f two statutes appear to be in conflict but can be construed as consistent with each other, then the court should give effect to both. . . . Therefore, [w]e must, if possible, read the two statutes together and construe each to leave room for the meaningful operation of the other." (Citations omitted; internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, supra, 157.